Tony ADDISON *v.* STATE of Arkansas

CR 87-176                          765 S.W.2d 566

Supreme Court of Arkansas
Opinion delivered February 20, 1989

2

*William R. Simpson, Jr.*, Public Defender, by: *Jerry Sallings*, Deputy Public Defender, for appellant.

*Steve Clark*, Att'y Gen., by: *Olan W. Reeves*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. In three separate trials which have been consolidated for this appeal, appellant Tony Addison was convicted of three counts of rape, three counts of burglary, one count of robbery, and one count of theft of property and sentenced to a total of life plus 200 years. For reversal he argues that the trial court erred in refusing to suppress certain custodial statements made to police in that these statements were taken in violation of the fifth amendment; that it erred in refusing to suppress the statements, photographs of him, and in-court identifications because this evidence was taken in violation of the fourth amendment; and that his due process right to a fair trial was denied in that his trial proceeded despite there being a bona fide question as to his mental fitness. We find no error and affirm the trial court.

In September, October, and November of 1986, four women were raped in the area of Little Rock known as the Quapaw

4

Quarter. Officers who patrolled the area were given a description of the suspect based upon various victims' reports: black male, 5 feet 6 to 5 feet 8 inches tall, 135 to 160 pounds, in his twenties, a large nose, a "Jeri curl" (a wet, curly hairstyle), and wearing a gold chain.

At 10:40 p.m. on December 5, 1986, Officer Ken Blankenship, while driving in the same general area in which the rapes had occurred, spotted Addison, who fit the general description of the suspect, crossing a street. The officer turned around, stopped Addison, and noticed he wore a gold chain and had a large nose and a "Jeri curl," which was straightening out. Addison did not have any identification, gave the officer several reasons for being in the area, and could not tell him at which address he just had been. As the officer was talking with Addison, two other officers, who were on patrol in the area, walked up and also questioned him. Officer Blankenship told him that he fit the description of the rape suspect and that he was in the same area at the same time in which the rapes had occurred. The officer then asked him if he would mind going to the police station's detective division. Addison replied that he had "no problem with that" and asked if the officers would take him home later. Blankenship responded they would do so as soon as they got through with him. None of the officers informed him that he had no legal obligation to go to the station or that he was not under arrest. From the time that the officers first talked to Addison until the time he was transported to the police station was approximately fifteen to thirty minutes.

Upon Addison's arrival at the station at around 11:00 p.m., Detective Ronnie Smith advised him that he was there voluntarily. Smith then questioned him concerning the series of rapes. The only statement that he gave at this time was that he did not rape anyone. Thereafter, Addison agreed to be fingerprinted and photographed. He was then taken home. During the one-hour period in which Addison was at the station, he was never told that he was free to leave or that he was not under arrest.

Subsequently, police officers took a photo spread, which included Addison's photograph, to one of the victims, who positively identified Addison as her attacker. After an arrest warrant was prepared, the police arrested him at 1:35 a.m. at his home. The police advised him of his rights via a standard Little

Rock Police Department advice of rights and waiver form. Thereafter, the police took him to the station. From approximately 2:00 until 5:30 a.m., Addison confessed to the crimes in separate signed statements, each preceded by a standard rights warning. Later in the day, he was identified by the victims in a live lineup.

## FIFTH AMENDMENT RIGHTS

Addison contends that his statements should have been suppressed on the grounds they were taken in violation of his fifth amendment rights under the United States Constitution as (1) the rights warning failed to inform him that he could have an attorney present even if he could not afford one and (2) under the totality of the circumstances, the statements were not freely and voluntarily given. We hold to the contrary.

Addison signed the following rights waiver form before each of his confessions was taken:

> I, Tony Addison, date of birth 01/23/67, now live at 2910 Fulton. I have been advised that I am a suspect in a rape, that I have the right to use the telephone, that I have the right to remain silent, that I have the right to talk to an attorney, either retained by me or appointed by the Court, before giving a statement, and to have my attorney present when answering questions. I have also been advised if I waive these rights, I have the right to stop the interrogation at any time. Also, that any statement I give will be used in a Court of Law against me. I have read the above statement of my rights and I understand them. No promises or threats have been made to induce me into making a statement.

In *Mayfield v. State*, 293 Ark. 216, 736 S.W.2d 12 (1987) (U.S. appeal pending), we held that an almost identical waiver form was deficient in that it did not advise the appellant that if he were indigent, he could have a lawyer free of charge. However, failure to give an appropriate warning does not automatically require reversal. In his motion to suppress, Addison did not question the sufficiency of the rights form. Rather, he asserted that his statements were not freely and voluntarily given after an intelligent waiver of his constitutional rights. Since this matter is

being raised for the first time on appeal, we will not consider it. *See Barnes* v. *State*, 294 Ark. 369, 742 S.W.2d 925 (1988).

In determining whether Addison's statements were voluntarily and freely given, we make an independent review of the totality of the circumstances and will reverse only if the trial court's findings are clearly against the preponderance of the evidence. *Hurst* v. *State*, 296 Ark. 448, 757 S.W.2d 558 (1988); *McDougald* v. *State*, 295 Ark. 276, 748 S.W.2d 340 (1988); *Scherrer* v. *State*, 294 Ark. 227, 742 S.W.2d 877 (1988). The burden is on the State to show that the confessions were made without hope of reward or fear of punishment. *Duncan* v. *State*, 291 Ark. 521, 726 S.W.2d 653 (1987). Conflicts in testimony are for the trial court to resolve as it is in a superior position to determine the credibility of witnesses. *Id.*

Pursuant to the "totality of the circumstances" approach, we focus on two basic components: the conduct of the police and the vulnerability of the accused. *Scherrer, supra.* Some of the factors that we consider in making the determination of whether a confession was voluntary include the youth or age of the accused, lack of education, low intelligence, lack of advice as to constitutional rights, length of detention, repeated and prolonged questioning, and use of physical punishment. *Id.*; *Jackson* v. *State*, 284 Ark. 478, 683 S.W.2d 606 (1985).

Addison was nineteen at the time that he gave the statements and was able to read and write. Although he testified that he signed the statements because he was forced to and did now know he had a choice, Detective Smith testified there was no force or coercion used in the questioning process. The record is devoid of any evidence that the police punished or threatened to punish Addison, promised him leniency if he cooperated, or deceived or tricked him in any way. Although the questioning process lasted approximately three hours, this was justified considering the number of offenses to which Addison confessed.

We are troubled by the fact that law enforcement personnel continue to utilize standardized warning forms which fail to clearly advise a suspect that he has a constitutional right to have an attorney free of charge if he cannot afford one. Although lack of advice of constitutional rights is a significant factor in our determination of whether a confession was voluntary under the

"totality of the circumstances" test, it is not determinative. A confession can be voluntary even if *Miranda* warnings were omitted. *See Michigan* v. *Tucker*, 417 U.S. 433 (1971). *See also Dillard* v. *State*, 275 Ark. 320, 629 S.W.2d 291 (1982).

■ As noted above, the officers did not use physical force, threats of physical force, or deceit to obtain the statements, nor did they promise Addison leniency if he cooperated. In addition, there is no indication from the record that Addison was inordinately vulnerable. On balance, we cannot say that the trial court's finding that the statements were freely and voluntarily given is clearly against the preponderance of the evidence.

## FOURTH AMENDMENT RIGHTS

Addison argues that the trial court erred in refusing to suppress his custodial statements, photographs of him, and in-court identifications by the victims on the basis that they resulted from an unlawful stopping and subsequent custodial detention in violation of his fourth amendment rights. It is his contention that these pieces of evidence were tainted fruit of the illegal stopping and detention under *Wong Sun* v. *United States*, 371 U.S. 471 (1963), and inadmissible. We disagree.

The fourth amendment guarantees the right of people to be secure against unreasonable searches and seizures. A person has been "seized" within the meaning of the fourth amendment only if, in view of all the circumstances, a reasonable person would have believed that he was not free to leave. *United States* v. *Mendenhall*, 446 U.S. 544 (1980). *Burks* v. *State*, 293 Ark. 374, 738 S.W.2d 399 (1987). A seizure pursuant to an arrest or any other detention that severely intrudes upon a person's liberty, such as a custodial interrogation, must be supported either by probable cause or by clear and positive testimony that demonstrates consent. *Id. See Rose* v. *State*, 294 Ark. 279, 742 S.W.2d 901 (1988). *See also Foster* v. *State*, 285 Ark. 363, 687 S.W.2d 829 (1985), *cert. denied*, 482 U.S. 929 (1987). "[D]etention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway* v. *New York*, 442 U.S. 200 (1979). *See also Kiefer* v. *State*, 297 Ark. 464, 762 S.W.2d 800 (1989); *Burks, supra*.

Under Rule 3.1, a suspect may be stopped and detained for questioning on reasonable suspicion. *See Terry* v. *Ohio*, 392 U.S. 1 (1968). This rule provides as follows:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

For the purposes of Rule 3.1, "reasonable suspicion" means a suspicion based upon facts or circumstances which give rise to more than a bare, imaginary, or purely conjectural suspicion. Ark. R. Crim. P. 2.1.

■ The initial stopping of Addison and his detention on the street were permissible since the facts and circumstances known to the investigating officers provided reasonable suspicion that Addison was the perpetrator of the rapes. Ark. R. Crim. P. 3.1. Officer Blankenship testified that Addison fit the description of the rapist, was in the same general area at the time in which the rapes had occurred, had no identification, gave several reasons for being in the area, and could not tell the officers at which address he just had been. These circumstances provided more than a bare, imaginary, or purely conjectural suspicion that Addison was the culprit.

Addison's subsequent detention for custodial interrogation at the police station was not authorized by Rule 3.1 because the rule by its plain language does not contemplate the detention of persons at one place and a subsequent detention at a police station. Moreover, his detention was not in conformity with Ark. R. Crim. P. 2.3.

Ark. R. Crim. P. 2.3 provides as follows:

> If a law enforcement officer acting pursuant to this rule requests any persons to come to or remain at a police station, prosecuting attorney's office or other similar place, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.

One of the officers testified that he asked Addison if he would mind going down to the station, to which Addison replied that he had "no problem with that." Addison then asked if the officers would take him home later. An officer responded, "after we get through with you." Another officer stated that he told Addison that he was at the station voluntarily. In either event, none of the officers specifically informed him that he had no obligation to be there or that he could leave if he wanted. Clearly, the officers breached the positive duty mandated by Rule 2.3. *See Burks, supra.*

In light of the authorities' failure to comply with our Rules of Criminal Procedure and the fact that detention for custodial interrogation intrudes so severely on interests protected by the fourth amendment, we conclude that Addison's detention for custodial interrogation constituted a seizure within the meaning of the fourth amendment and thus must be supported either by probable cause or consent. *See Kiefer, supra; Burks, supra.*

Probable cause exists where there is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man to believe that a crime has been committed by the person suspected. *Id.; Hines v. State*, 289 Ark. 50, 709 S.W.2d 65 (1986). Probable cause to arrest without a warrant does not require the quantum of proof necessary to sustain a conviction. *Burks, supra.* The determination of probable cause is based upon factual and practical considerations of everyday life upon which ordinary men, not legal technicians, act. *Hines, supra.* A nontechnical approach correctly balances the competing interests of the individual and society, so that law enforcement officers will not be unduly hampered, nor law abiding citizens left to the mercy of overzealous police officers. *Id.* In making the determination of probable cause, we are liberal

rather than strict. *Sanders* v. *State*, 259 Ark. 329, 532 S.W.2d 752 (1976).

Addison was in the same general area at the time in which the rapes took place, fit the description of the rapist, did not have any identification, gave several reasons for being in the area, and could not tell the officers at which address he just had been. Although Officer Blankenship testified he did not have probable cause to arrest Addison, the issue of probable cause to arrest or detain is a matter of law for this court to determine. In this instance, the evidence established probable cause to support Addison's detention at the station. Since there was probable cause to detain Addison, it is not necessary for us to address the issue of consent.

## RIGHT TO DUE PROCESS

Addison finally contends that his due process right to a fair trial was denied in that his trial proceeded despite there being a bona fide question as to his mental fitness. We hold to the contrary.

In January of 1987, the appellant pleaded not guilty by reason of mental disease or defect to the charges against him. Pursuant to an order of commitment and evaluation, he was admitted to the Arkansas State Hospital. After a thirty-day observation and evaluation, the hospital reported that Addison appeared to be aware of the nature of the charges brought against him, that he was capable of cooperating with his attorney, and, at the time of the commission of the alleged offense, he did not lack the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law. The report also stated that Addison had an adjustment disorder with depressed moods and mixed personality traits. Following this report, Addison was tried on June 17 and July 1, 1987, in separate trials on separate counts. However, prior to a third trial, Addison's attorney indicated that since the July 1st trial, Addison had been experiencing drastic behavior changes. He was noncommunicative, unable to sleep, and having auditory hallucinations.

Based upon this new information, Addison's attorney, prior to trial, asked for a continuance so that Addison could be reexamined at the Arkansas State Hospital. The trial judge

decided he would proceed with the trial and that an evaluation should be made by Dr. Alfred Rosendale, an independent psychiatrist, over the noon hour to determine if Addison needed further evaluation. If so, the judge stated that he would grant a mistrial. Addison's counsel agreed to this procedure.

Dr. Rosendale examined Addison for about an hour and fifteen minutes during recess. Based upon this examination, Dr. Rosendale concluded that Addison was beginning to have auditory hallucinations and was becoming psychotic. However, when asked by the trial judge if Addison was aware of the nature of the charges and proceedings against him and capable of cooperating in his defense, the doctor replied in the affirmative. On cross-examination, the doctor testified that Addison did not meet the definition of insanity under Arkansas law. On the basis of this testimony, the trial judge elected to proceed.

Ark. Code Ann. § 5-2-302 (1987), formerly Ark. Stat. Ann. § 41-603 (Repl. 1977), provides that "[n]o person who, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist effectively in his own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures." The conviction of an accused while he is legally incompetent to stand trial violates due process. *Pate* v. *Robinson*, 383 U.S. 375 (1966); *Jacobs* v. *State*, 294 Ark. 551, 744 S.W.2d 728 (1988). In order to be competent to stand trial, a defendant must have the capacity to understand the nature and object of the proceedings brought against him, to consult with counsel, and to assist in the preparation of his defense. *Drope* v. *Missouri*, 420 U.S. 162 (1975); *Jacobs, supra.*

Ark. Code Ann. § 5-2-305(a)(2) (1987), formerly Ark. Stat. Ann. § 41-605(1)(b) (Repl. 1977), provides in pertinent part that whenever a defendant charged in circuit court files notice that he intends to rely upon the defense of mental disease or defect, or there is reason to believe that mental disease or defect will or has become an issue, or there is reason to doubt his fitness to proceed, the trial court, subject to the provisions of §§ 5-2-304 and 5-2-311, shall immediately suspend all further proceedings in the prosecution. Upon suspension of proceedings, the court shall enter an order appointing at least one qualified psychiatrist to make an examination and report on the mental condition of the

defendant. Ark. Code Ann. § 5-2-305(b)(2). This report must include (1) a description of the nature of the examination, (2) a diagnosis of the mental condition of the defendant, (3) an opinion as to his capacity to understand the proceedings against him and to assist effectively in his own defense, and (4) an opinion as to the extent, if any, to which the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired at the time of the conduct alleged. Ark. Code Ann. § 5-2-305(d). If neither party contests the finding in the report, the court may make the determination of the fitness to proceed. Ark. Code Ann. § 5-2-309 (1987). If the finding is contested, the court shall hold a hearing on the issue. *Id.*

■ On appeal, we affirm where there is substantial evidence to support the trial court's findings concerning a defendant's fitness to proceed. *Smith* v. *State*, 282 Ark. 535, 669 S.W.2d 201 (1984). Substantial evidence is evidence of sufficient force and character to compel a conclusion of reasonable and material certainty. *Id.*

■ Since there was reason to doubt Addison's fitness to proceed, the trial judge requested that a qualified psychiatrist examine Addison during recess. As noted above, Addison's counsel consented to this procedure. After an hour and a half examination, Dr. Rosendale gave the court an examination report on the mental condition of the appellant as required by § 5-2-305. Since neither party contested the finding of his report, it was for the trial court to determine Addison's fitness to proceed. § 5-2-309. Based upon the report, the trial judge decided that he was fit for trial. We conclude that the judge was in substantial compliance with our code provisions and that there is substantial evidence to support his findings.

Pursuant to Ark. Sup. Ct. R. 11(f), we have made our own examination of all other objections made at trial and find no reversible error.

Affirmed.

Special Justice SAM PERRONI and HICKMAN and HAYS, JJ., concur.

GLAZE, J., not participating.

DARRELL HICKMAN, Justice, concurring. We are unanimous that this case should be affirmed but divided on the reasons.

I write separately, not only to make it clear I do not join the majority opinion, but also to join that part of Justice Perroni's opinion on the stop and the reasonable suspicion application of the A.R.Cr.P. Rules.

His view is essentially parallel to what the law is in this regard. I would not reach the question of probable cause.

HAYS, J., joins the concurrence.

SAMUEL A. PERRONI, Special Justice, concurring. I agree with all aspects of the majority opinion except for its finding on the Fourth Amendment issue. I do not believe there was probable cause to arrest or detain Addison. Moreover, I am of the opinion that the officer's conduct, after the initial stop and detention, did not constitute a seizure which would implicate the Fourth Amendment to the United States Constitution.

On the Fourth Amendment issue, Addison argues that his identification as the rapist and his confessions followed directly and uninterruptedly from an illegal detention by the police and therefore the evidence should have been suppressed. The grounds for suppression urged by Addison are (1) that Officer Blankenship lacked reasonable suspicion to stop him and (2) he was illegally detained after he was stopped by the officer. It is Addison's contention that the evidence sought to be suppressed was tainted fruit of his illegal stop and detention under *Wong Sun v. United States*, 371 U.S. 471 (1963).

*The Stop*

The authority in Arkansas for stopping a suspect absent probable cause is found in Rule 3.1 of the Arkansas Rules of Criminal Procedure. The rule is patterned after the United States Supreme Court's decision in *Terry* v. *Ohio*, 392 U.S. 1 (1968). Rule 3.1 provides as follows:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons

or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. An officer acting under this rule may require the person to remain in or near such place in the officer's presence for a period of not more than fifteen (15) minutes or for such time as is reasonable under the circumstances. At the end of such period the person detained shall be released without further restraint, or arrested and charged with an offense.

For purposes of Rule 3.1, "reasonable suspicion" is defined in Rule 2.1 of the Arkansas Rules of Criminal Procedure as follows:

"Reasonable suspicion" means a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion.

At this point, an appreciation of the circumstances preceding Addison's stop is important.

Over a nine week period, there were four reported rapes and one attempted rape in the area where Addison was stopped. Four of the crimes were committed on Friday, Saturday or Sunday and all of the crimes were committed in the late evening or early morning.

The victims' identifications of their assailant was uniformly consistent in several respects and the incident involving one victim's husband all but confirmed the fact that the assailant was on foot and acting alone. There was also reason to believe that the assailant had used a fictitious name. Moreover, police protection in the area was obviously increased and they were interested in checking out all possible suspects.

On appeal, Addison argues that the officer lacked reasonable suspicion to stop him and that his stop was the result of a "dragnet" approach to investigating the crimes due to the fact that others were also stopped that night. I disagree.

Addison was travelling on foot and alone at 10:40 p.m. on a Friday night. He was in the general area where the crimes were committed and he fit the description of the rapist. These circumstances provided considerably more than a bare, imaginary, or purely conjectural suspicion that Addison was the culprit. Likewise, the detention of Addison on the street was lawful under Rule 3.1 because Addison had no identification, gave several different reasons for being in the area, and could not tell the officers the address of where he had just been.

It is true that the officers had stopped at least two other suspects that night. However, this can hardly be considered to parallel the type of "dragnet" investigative process outlined by the United States Supreme Court in *Davis* v. *Mississippi*, 394 U.S. 721 (1969). In *Davis*, the Supreme Court condemned a procedure where police randomly rounded up black males for the purpose of obtaining their fingerprints. The principles announced in *Davis* are simply not applicable to this case.

## The Detention

Next, Addison argues that he was illegally detained after his stop by Officer Blankenship. He relies primarily on Rules 2.3 and 3.1 of the Arkansas Rules of Criminal Procedure and our decisions in *Meadows* v. *State*, 269 Ark. 380, 602 S.W.2d 636 (1980), and *Rodriquez* v. *State*, 262 Ark. 659, 559 S.W.2d 925 (1978), to support three grounds for this argument.

First, Addison contends that if, under Rule 3.1, the officer had reasonable suspicion to stop and detain him, the officer was required to cause his release immediately upon learning his identity. As a product of this, Addison claims that because his photograph was taken after his identity was determined by the detective, the act of obtaining his photograph was investigative in nature and in violation of Rule 3.1. Secondly, Addison argues that consent cannot be relied upon in this case. He reasons that the state failed to prove his conduct was voluntary and that Officer Blankenship did not tell him that he didn't have to go to the station. Finally, Addison maintains that his consent was merely acquiescence to a claim of lawful authority.

These arguments ignore the facts and misconstrue the law.

I have concluded that Officer Blankenship had legal justifi-

cation for stopping Addison pursuant to Rule 3.1 of the Arkansas Rules of Criminal Procedure. *See also, Terry* v. *Ohio,* 392 U.S. 1 (1968).

Once stopped, the officer was presented with additional factors which would have led him to reasonably suspect that Addison had committed the rapes. Moreover, the officer's attempts to verify Addison's identity, or the lawfulness of his conduct, also proved unsuccessful. As a result of this, the officer became faced with the prospect of witnessing an unknown suspect depart the area without taking any steps to satisfy himself that he could be found again.

In view of the fact that Addison's identity had not been verified, the officer's immediate release of Addison on the street was not required under the law nor expected under the circumstances.

If the scope of an investigation during a stop becomes unreasonable, the detention will be considered a formal arrest that must be supported by a probable cause. *Florida* v. *Royer,* 460 U.S. 491 (1983). However, there is nothing unreasonable, or, for that matter, surprising about the officer asking Addison if he would mind going to the station. Conversely, when Addison agreed to go it would be unreasonable, under the circumstances, to hold that the officer was required to tell Addison he didn't have to go if he didn't want to.

Rule 2.3 of the Arkansas Rules of Criminal Procedure requires only that the officer "take such steps as are reasonable" to make clear that there was no legal obligation to comply with the officer's request. It follows that the "steps" to be taken must be evaluated on a case-by-case basis considering the totality of the circumstances.

Having found that the officer's actions did not violate any provisions of the Arkansas Rules of Criminal Procedure, the next inquiry must be whether the officer's actions, after the initial detention on the street, constituted a seizure which implicates the Fourth Amendment. A seizure occurs when, under the totality of the circumstances, a reasonable person would believe he is not free to leave. See, *United States* v. *Mendenhall,* 446 U.S. 544 (1980), and *INS* v. *Delgado,* 466 U.S. 210 (1984).

In *Mendenhall*, Justice Stewart identified four circumstances that may indicate that a Fourth Amendment seizure has occurred. They are "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554.

None of these circumstances are present in this case.

In this case, Addison was released after his initial stop and the trial court found that the question of going to the station was more of an "afterthought" on the officer's part. In addition, when he was asked if he would mind going to the station, Addison's only question was whether the officers would take him home after he went to the station. That response was uncontradicted at the hearing and suggests that Addison knew that he was under no legal obligation to accompany the officers to the station. In addition, through all of this, according to the officer, Addison did not act as if he didn't want to go.

At the station, Addison was reminded that he was there voluntarily. Again, there was no evidence offered to negate this statement. Addison was subsequently told why he was there and he agreed to be fingerprinted and photographed to assist the police in eliminating him as a suspect. Apparently, Addison's photograph was the only piece of evidence obtained from him at the station that led in any way to his arrest and conviction of rape, burglary and theft of property.

The United States Supreme Court in *Hayes* v. *Florida*, 470 U.S. 811 (1985), outlined those circumstances under which the police may make a brief detention of a suspect in the field for fingerprinting based upon less than probable cause. The Court in *Hayes* reasoned that:

> There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch. 470 U.S. 817.

If, then, Officer Blankenship had possessed a camera with him in the field he could have taken Addison's picture without implicating the Fourth Amendment. Apparently, under *Hayes*, this could have been done without Addison's consent because the procedure was reasonable, represented a much less serious intrusion upon personal security and involved evidence of a non-testimonial nature. *Hayes v. Florida, supra.*

I am unable to see how the circumstances of Addison's voluntary trip to the station could rise to a constitutional level where the scope of the investigation, i.e., taking photographs and fingerprints, was not overly intrusive, was limited in nature, and was reasonable. Therefore, the officer's conduct, after the initial stop and detention, did not constitute a seizure which would implicate the Fourth Amendment to the United States Constitution.

*Consent*

Next is the issue of legal consent as it pertains to the facts of this case.

I have thoroughly examined this issue, and am convinced that the traditional standards which control a normal consent search situation are appropriate for the disposition of this case. I rely upon the totality of the circumstances test adopted by the United States Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

It is incumbent on the state to prove consent by clear and positive testimony, *Burks v. State*, 293 Ark. 374, 738 S.W.2d 399 (1987), and the state's burden is not met by showing only acquiescence to a claim of legal authority. *Burks v. State, supra; Rodriquez v. State*, 262 Ark. 659, 559 S.W.2d 925 (1978).

Nonetheless, based upon the testimony at the suppression hearing, including Addison's testimony, and the totality of the relevant circumstances, I believe that Addison voluntarily accompanied the police to the station and while there consented to be photographed and fingerprinted.

In *Schneckloth*, the defendant moved at trial to suppress evidence which had been obtained in a search of an automobile in which he was a passenger. A police officer had legally stopped the

car and was given permission by the driver to search it. Bustamonte argued that his consent was involuntary because the driver was not informed of his right to refuse the search. In considering the appropriate standard for determining whether the consent was voluntary, the United States Supreme Court turned for guidance to cases which deal with voluntariness of a defendant's confession under the Fourteenth Amendment. After reviewing these cases the high court concluded:

> The significant fact about all of these decisions is that none of them turned on the presence of absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. See *Miranda* v. *Arizona*, 384 U.S. 436, 508 (Harlan, J., dissenting); id., at 534-535 (White, J., dissenting). In none of them did the Court rule that the Due Process Clause required the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer the questions that were put. While the state of the accused's mind, and the failure of the police to advise the accused of his rights, were certainly factors to be evaluated in assessing the "voluntariness" of an accused's responses, they were not in and of themselves determinative. (Citations omitted)

> Similar considerations lead us to agree with the courts of California that the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. 412 U.S. 226-27.

Addison's claim that he believed he was required to go to the station is not determinative. The test is what a reasonable person would have believed, *United States* v. *Mendenhall, supra,* and voluntariness does not depend upon whether the police informed Addison that he could decline to cooperate. *Schneckloth* v. *Bustamonte, supra.*

Finally, Addison raises the factual issue of whether the situation on the street produced enough legally colorable coercion

to reduce his consent to "mere acquiescence to claimed lawful authority." *Bumper* v. *North Carolina*, 391 U.S. 543 (1968).

*Bumper* stands for the proposition that a search can never be justified on the basis of consent when that consent has been given after an official has asserted that he or she possesses a warrant.

I do not liken this case to one in which a search is conducted pursuant to an invalid or nonexistent search warrant. There was no misrepresentation as to what was required of Addison or the validity of the officer's actions.

I join the majority, however, in affirming the trial court.