Terry SIMS *v.* STATE of Arkansas

CR 94-934 900 S.W.2d 508

Supreme Court of Arkansas
Opinion delivered May 22, 1995

*Maxie G. Kizer*, for appellant.

*Winston Bryant*, Att'y Gen., by: *David R. Raupp*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Terry Sims, was convicted of capital felony murder and sentenced to life imprisonment without parole. On appeal, he asserts the following three points of error: (1) that the State unconstitutionally used its peremptory strikes to exclude African-Americans from the petit jury; (2) that the trial court erroneously denied the motion to transfer his case to juvenile court; and (3) that his confession was illegally taken. After examining these points as well as all objections decided adversely to Sims pursuant to Ark. Sup. Ct. R. 4-3(h), we affirm.

### Facts

On December 15, 1992, the body of Mary Lou Jones was discovered behind the counter at Cloud's Grocery Store in Casscoe, Arkansas. An employee of the store, Ms. Jones had been shot three times in the head. The owner, Julian Russell, had also been shot and was on the floor behind the store's meat counter. He died at a Little Rock hospital the following evening.

Police discovered the movie "52 Pickup" and a receipt for its rental on the store's counter bearing the name of the appellant, Terry Sims, then sixteen years old. When Arkansas State Police Investigator Lloyd Franklin phoned Sims on December 16, Sims told him that he had returned the movie to the store during his lunch break at school on December 15. Unaware that Investigator Franklin had spoken with Sims, Investigator Gary Allen interviewed him as a potential witness on December 29, at which time Sims stated that he had returned the tape to the store shortly after 7:00 p.m. on December 15.

Based upon the discrepancies in Sims's statements to these two officers, Sims was interviewed by Investigators John McCord and John Howell on January 5, 1993, and gave a voluntary statement without either of his parents being present to consent to waiver of his right to counsel. Discovering inconsistencies in

Sims's January 5 statement after speaking with another witness, the officers interviewed Sims at 4:00 p.m. on January 8. At that time, Sims gave another voluntary statement implicating others in the murders. Subsequently, at 9:38 p.m., after being advised of his *Miranda* rights, Sims, again without either of his parents being present, admitted to the murders.

According to the last statement Sims gave to the police, he and accomplice Albert Bell went to Cloud's Grocery Store on the night of the incident, and Sims returned the movie while Bell asked Mr. Russell if he had any fuses. While Mr. Russell was looking for fuses, Sims shot him approximately five times. Ms. Jones began screaming, and after she gave Bell approximately $200 from the register and picked up the telephone, Sims shot her twice. Sims and Bell then went to Sims's car and drove to a friend's house.

Sims was charged by felony information with two counts of capital felony murder. Prior to trial, Sims filed motions to transfer his case to juvenile court, to change venue, and to suppress his statements to police, all of which were denied following separate hearings. At trial, the jury, after hearing all the evidence, found Sims guilty as charged, and, although the State sought the death penalty, the jury recommended that Sims be sentenced to life imprisonment without parole. The trial court entered judgment against Sims, from which he now appeals.

## I. Batson *objection*

For his first point of error, Sims claims that the State unconstitutionally used its peremptory strikes to exclude African-Americans from the petit jury. Ms. Tisinger, a minority venire member, was struck by the State. Sims objected, and the prosecutor offered the following explanation for striking Ms. Tisinger:

> First of all, Ms. Tisinger was acquainted with the defendant's sister and went to school with her for twelve years. Secondly, I got some mixed signals about what she would require of the state in proving this case against the defendant. Third, quite frankly I think she was much too anxious to say that she would impose the death penalty. I have some questions about her desire to try and get on this jury to do something. I am concerned about all three of these

factors. I am not seeking to do anything because of her race. I would point out that there are prior African-American jurors that have been seated on this case.

Sims responded that Ms. Tisinger's responses were no different than those of any other jurors, and that she stated that she had not spoken to Sims's sister in a number of years. The trial court held that a *prima facie* case was not made, stating as follows:

> I have reviewed Mr. Hall's work on the subject and his digest of cases and read several of the cases cited therein as well as *Batson* itself. For the record I would note that the state has exercised four peremptory challenges, three of which were used to excuse whites and one of a black, a Ms. Ellis. She had a wide variety of matters or answers that could give a prosecutor pause. The other prospective black jurors that have been excused were Ms. Hancock, Ms. Lockett and Ms. Dabner for their inability to consider the death penalty. Ms. Briggs was a cousin of the defendant. Ms. Jones, my notes reflect, had already made up her mind.

> (After counsel for Sims commented that he had no objection to Ms. Jones being excused, the trial court continued.)

> Mr. Ferguson is so far the only black juror to be seated. Having said all that I cannot find a pattern here of discrimination or an attempt to exclude all of the blacks from the panel. I would note too that Ms. Tisinger's answers were technically correct in almost all aspects but I can find some justification for [the prosecutor's] gut reaction to Ms. Tisinger as a juror. She does have a basis of knowing or being acquainted with some members of the family. For that reason I will allow the peremptory.

The landmark case of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986), provides that the Equal Protection Clause forbids prosecutors from challenging potential jurors solely on the basis of race. See the recent application of the Batson doctrine in *Purkett* v. *Elem*, 115 S.Ct. 2635 (U.S. 1995).

In the recent case of *Rockett* v. *State*, 318 Ark. 831, 863 S.W.2d 235 (1994), we set out the procedures which are to be followed in Arkansas when a *Batson* objection is raised:

> First, the defendant must make a *prima facie* case that racial discrimination is the basis of a juror challenge. In the event the defendant makes a prima facie case, the state has the burden of showing that the challenge was not based on race. Only if the defendant makes a prima facie case and the state fails to give a facially neutral reason for the. challenge is the court required to conduct a sensitive inquiry.

319 Ark. at 839, 863 S.W.2d at 239 (*quoting Franklin* v. *State,* 314 Ark. 329, 338, 863 S.W.2d 268, 273 (1993)). The standard of review for reversal of a trial court's *Batson* ruling is whether the court's findings are clearly against the preponderance of the evidence. *Bradley* v. *State,* 320 Ark. 100, 896 S.W.2d 425 (1995); *Rockett* v. *State, supra; Colbert* v. *State,* 304 Ark. 250, 801 S.W.2d 643 (1990).

In his brief, Sims contends that the issue of whether a *prima facie* case of discrimination was made is moot, relying on the United States Supreme Court decision in *Hernandez* v. *New York,* 500 U.S. 352 (1991). We agree with the State's assertion that Sims's reliance on the case is misplaced, as in that case, the trial court had no opportunity to rule on whether a *prima facie* case of discrimination had been shown; rather, the trial court only ruled on the question of intentional discrimination, and, as such, the Supreme Court concluded that the issue of whether a *prima facie* case had been made was moot. *Id.* at 1866. Conversely, in this case, the trial court ruled that a *prima facie* case had not been made, and alternatively, that intentional discrimination had not been shown.

 Sims also asserts that the striking of Ms. Tisinger in and of itself established a *prima facie* case of racial discrimination. *See e.g. Franklin* v. *State.* Sims's reliance on *Franklin* is strained, as in that case, while we held that a *prima facie* case was shown when the State challenged the first African-American juror called, we recognized that that case was one "fraught with racial overtones," and concluded that a racially neutral explanation was required "under the totality of relevant facts." *Franklin* at 338-339, 863 S.W.2d at 273. Whereas the jury in *Franklin* was composed entirely of white persons by the time the trial court ruled on Franklin's *Batson* motion, in this case, Juror Ferguson,

an African-American, had been seated as a juror prior to the State's challenge of Ms. Tisinger.

Prior to the striking of Ms. Tisinger, the State had used its first peremptory challenge to excuse an African-American veniremember, Ms. Ellis, and three more peremptory challenges to excuse white veniremembers. While Sims made a *Batson* objection when the State excused Ms. Ellis, Sims does not abstract this portion of the record and from what little information we have before us, we see no pattern of discrimination. Furthermore, Sims does not furnish us with a comprehensive analysis of the jury's composition; rather, with the exception of Ms. Tisinger's examination, he only abstracts the voir dire examinations of the jurors who were seated. While the State maintained in its argument to the trial court that other African-American jurors had been seated as jurors, we have no evidence of the jury's composition other that the trial court's comment and Sims's concession in his brief that at least one African-American, Juror Ferguson, had been seated prior to the striking of Ms. Tisinger. Under these circumstances, certainly there has been no showing of a *prima facie* case of discrimination with reference to the excusal of Ms. Ellis or Ms. Tisinger.

Alternatively, the State did furnish racially-neutral reasons for striking Ms. Tisinger. The prosecutor based his first reason on the fact that she had gone to school with Sims's sister for twelve years. Sims challenges the State's reasoning, asserting that Ms. Tisinger's testimony regarding her knowledge of Sims's sister was "equivalent" to that of Juror Hammans, who had known the victims and was seated prior to the striking of Ms. Tisinger. Juror Hammans stated that while he did not know them well, he did know the victims, as he had stopped by Cloud's Grocery during turkey season to get a Coke. Also seated prior to the State's peremptory challenge of Ms. Tisinger was Juror Houten, who stated that, while she could have seen Sims when she worked at his high school, she did not remember his face. We cannot say that the testimony of either Jurors Hammans or Houten was "equivalent" to that of Ms. Tisinger. Even if we were to agree with Sims's comparision, the prosecutor offered additional racially neutral reasons for striking Ms. Tisinger, as he stated that he had gotten some mixed signals about what Ms. Tisinger would require in terms of the State's proof against Sims. We note that this concern

was in fact reflected in a question posed to Ms. Tisinger during voir dire examination, as the prosecutor specifically inquired as to her hesitation in answering a question. Finally, the prosecutor explained that he thought that Ms. Tisinger seemed much too anxious to say that she would impose the death penalty. Under these circumstances, the trial court's overruling of Sims's *Batson* objection was not clearly against the preponderance of the evidence.

## II. Denial of transfer

For his second point of error, Sims asserts that the trial court erroneously denied his motion to transfer his case to juvenile court. At a hearing on the motion, both parties stipulated that Sims was on juvenile probation at the time of the murders for theft of property, as he had unlawfully taken cattle and a cattle trailer. The trial court then heard testimony from Sims's mother, Thelma Sims, who related that her son was in the tenth grade at the time of his arrest for the Cloud's Grocery killings. While he had a few disciplinary problems where he would have to stay in detention, Mrs. Sims stated that Terry had never been expelled from school. According to Mrs. Sims, with the exception of the charge for which he was placed on juvenile probation, her son had never been charged with any other criminal offenses, nor did he have any alcohol, drug or health problems. Mrs. Sims concluded that she had taught Terry to do his chores, and that, after school, he would help his father on their farm.

The State offered the testimony of Arkansas County Sheriff Wayne Simpson, who testified that, on the date of the incident in question, he arrived at Cloud's Grocery to find Ms. Jones dead, as she had been shot, and was "lying on the floor with blood all beneath her head." According to Sheriff Simpson, there was no evidence that either victim had a weapon, and "[t]here was no way that either of the victims could have left the area without coming past their assailants." He further remarked that Sims had confessed and admitted being the person who fired the weapon used in the shooting.

Following this testimony, Sims offered his psychological evaluation completed by an independent psychiatrist, Dr. Brad Fisher, who stated in his report that Sims functioned "like a thirteen-year-old," and that his "immaturity" was coupled with "a strongly dependent character whose borderline intelligence and developmental lags look to outsiders for guidance in complex

situations." After hearing all the evidence, the trial court denied Sims's motion to transfer based upon the fact that Sims had been charged with capital murder involving the "violent death" of two victims, that Sims had a prior juvenile record at the time of the alleged offense consisting of a felony conviction for which he received probation, and "on all other matters of fact and law properly before the court."

■ We have recently decided the issue of the appealability of denials of transfer to juvenile court following a conviction in circuit court in *Hamilton v. State*, 320 Ark. 346, 896 S.W.2d 877 (1995). In that case, we announced a prospective rule, holding that an appeal from an order granting or denying transfer of a case from one court to another having jurisdiction over juvenile matters must be considered by way of interlocutory appeal, and an appeal from such an order after a judgment of conviction in circuit court is untimely and will not be considered. Because the case against Sims was commenced prior to our decision in *Hamilton*, we will address the merits of his argument.

■ As we stated in *Hamilton*, the standard of review in juvenile-transfer cases is whether the circuit court's denial of the motion was clearly erroneous. *See also Davis v. State,* 319 Ark. 613, 893 S.W.2d 678 (1995); *Beck v. State*, 317 Ark. 154, 876 S.W.2d 561 (1994); *Vickers v. State*, 307 Ark. 298, 819 S.W.2d 13 (1991). We have often stated that the serious and violent nature of an offense is a sufficient basis for denying a motion to transfer and trying a juvenile as an adult. *Id.; See also Walker v. State*, 304 Ark. 393, 803 S.W.2d 502, *Supplemental Opinion on denial of rehearing*, 304 Ark. 402-A, 805 S.W.2d 80 (1991); Here, the information alleged that Sims committed two counts of capital felony murder by "acting alone or with one or more persons, he caused the death[s] of Julian Russell [and Mary Lou Jones] in the course of and in furtherance of a felony under circumstances manifesting extreme indifference to the value of human life." At the hearing on the motion to transfer, Sheriff Simpson testified that he found Ms. Jones's body "lying on the floor with blood all beneath her head," and that Sims had confessed to shooting both victims. There was also evidence presented at the hearing that Sims was on juvenile probation at the time of the incident. Undoubtedly, there was clear and convincing evidence which supported the circuit court's denial of the motion to transfer; accordingly, it cannot be said that

its ruling was clearly erroneous. Moreover, Sims's date of birth was September 23, 1976, and because he had reached the age of eighteen, Sims could not then have been committed to a youth services center on conviction, and therefore a transfer of his case to juvenile court was unwarranted. *See Myers* v. *State*, 317 Ark. 70, 876 S.W.2d 246 (1994); *Bright* v. *State*, 307 Ark. 250, 819 S.W.2d 7 (1991). *See also* Ark. Code Ann. §§ 9-27-331(1) & 9-28-209(a)(1) (Repl. 1993).

### III. Admissibility of confession

For his final point of error, Sims maintains that his confession was illegally taken on the grounds that its admission violated a provision of the Arkansas Juvenile Code, particularly, Ark. Code Ann. § 9-27-317 (Repl. 1993), which provides that, when obtaining a juvenile's waiver of the right to counsel, the waiver must include a written and signed agreement by the juvenile and his parent, guardian, or custodian. At a hearing on his motion to suppress, Sims challenged the admission of the statements given to police on January 5 and January 8, 1993, without his parents being present to consent to the waiver of counsel. In response, the State specifically relied on the case of *Boyd* v. *State*, 313 Ark. 171, 853 S.W.2d 263 (1993), in arguing that the Arkansas Juvenile Code did not apply to Sims, as he was being charged as an adult in circuit court. Thereafter, the State stipulated to the fact that neither Mr. Sims or Mrs. Sims was present, nor was a juvenile intake or probation officer present during the taking of the statements. After hearing testimony from Sims, both his parents, and Investigators Howell and McCord of the Arkansas State Police, the trial court denied Sims's motion to suppress.

Sims argues that the cases of *Rhoades* v. *State*, 315 Ark. 658, 869 S.W.2d 698 (1994), in which we held that, when the State chooses to file its petition in juvenile court, the Juvenile Code provisions control, and *Boyd* v. *State, supra*, in which we held that the Arkansas Juvenile Code does not refer to proceedings to circuit court, rather, only to proceedings in juvenile court, are inconsistent, and urges us to overrule our decision in *Boyd*. We reconciled these two cases in *Ring* v. *State*, 320 Ark. 128, 894 S.W.2d 994 (1995), in which Ring brought an interlocutory appeal of an order denying his motion to transfer his case to juvenile court on the grounds that the trial court erred in admitting his confession

at his transfer hearing, as neither of his parents signed a written waiver of his right to counsel under § 9-27-317. At the time of Ring's confession to police, he had not yet been charged in circuit court. We rejected his argument, reasoning as follows:

> Appellant's reliance on *Rhoades* is misplaced. True, similar to appellant, Rhoades had not yet been charged in any court when he made his statement. Also similar to appellant, Rhoades was charged in circuit court. However, unlike appellant, Rhoades's case was transferred to juvenile court where he was ultimately adjudicated a delinquent. Thus, even though Rhoades had not yet been charged in circuit court when he gave his confession, because his offense was ultimately adjudicated in juvenile court, this court held that the Arkansas Juvenile Code applied to Rhoades at the time he gave his confession, such that the law enforcement officers' failure to comply with section 9-27-317 barred admission of Rhoades's confession at the adjudicatory hearing.
>
> The state responds that *Boyd* v. *State*, rather than *Rhoades*, controls the present case. In *Boyd*, this court stated that when a prosecutor chooses to prosecute a juvenile in circuit court as an adult, the juvenile becomes subject to the procedures and penalties prescribed for adults. Thus, the state argues that when a juvenile is charged in circuit court, the requirement in section 9-27-317 that the juvenile's parent consent to the juvenile's waiver of right to counsel is not applicable.
>
> The state's argument is correct. In *Boyd*, this court held that the Arkansas Juvenile Code does not refer to proceedings in circuit court, rather, only to proceedings in juvenile court. When *Rhoades* and *Boyd* are considered together and applied to the facts in this case, they imply but one conclusion: *since appellant was ultimately charged in circuit court and, upon this court's affirmance of the denial of his motion to transfer, will ultimately be tried there, the failure of the law enforcement officers to obtain the consent of appellant's parents to his waiver of right to counsel, as required by section 9-27-317, does not bar admission of appellant's confession. . .*

(Citations and footnote omitted.) (Emphasis added.)

In short, in light of our holdings in *Ring* v. *State, supra*, and *Boyd* v. *State, supra*, Sims's argument on this point is without merit.

### IV. Compliance with Ark. Sup. Ct. R. 4-3(h)

As Sims received a sentence of life imprisonment without parole, we must examine all objections decided adversely to him in accordance with Ark. Sup. Ct. R. 4-3(h). In a motion for change of venue, Sims submitted the affidavits of nine Arkansas County residents, each of whom opined that Sims could not receive a fair and impartial trial in the county. Sims also referred to a county newspaper article which quoted the prosecutor as stating that he expected "to have a problem" with finding a jury in the case against Sims, as there were "some awful strong feelings in Arkansas County about Cloud's Grocery," referencing an earlier murder trial involving the same store in 1975. Following a hearing, the trial court denied Sims's motion for change of venue. Article 2, section 10 of the Arkansas Constitution provides that a criminal defendant has the "right to a speedy and public trial by impartial jury of the county in which the crime shall have been committed," while venue "may be changed to any other county of the judicial district in which the indictment is found upon the application of the accused." *Sanders* v. *State*, 317 Ark. 328, 878 S.W.2d 391 (1994). However, "there can be no error in the denial of a change of venue in cases . . . where an examination of the jury shows that an impartial jury was selected and that each juror stated he or she could give the defendant a fair trial and follow the instructions of the court." *McArthur* v. *State*, 309 Ark. 196, 830 S.W.2d 842 (1992). Sims has in fact abstracted the voir dire examinations of each of the seated jurors, and upon review of these individual examinations, it appears that an impartial jury was selected and that each juror in fact indicated that he or she had not formed an opinion about Sims's guilt or innocence based upon what had been printed in the area newspapers. As such, there was no error.

Affirmed.

NEWBERN and ROAF, JJ., dissent for the reasons stated in the dissenting opinions in *Ring* v. *State, supra*, and *Boyd* v. *State, supra*.