Albert BELL *v.* STATE of Arkansas

CR 95-417                                                     920 S.W.2d 821

Supreme Court of Arkansas
Opinion delivered April 29, 1996
[Petition for rehearing denied June 3, 1996.*]

---

*DUDLEY, J., not participating.

*J. Bradley Green*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Albert Bell was charged with two counts of capital felony murder and was convicted of two counts of first-degree murder. He was sentenced to two consecutive life sentences. According to the state's evidence, Bell and Terry Sims went to Cloud's Grocery Store in Casscoe, Arkansas County, where Sims shot store employees Julian Russell and Mary Lou Jones while Bell took money from the cash register. Bell was sixteen years old when these crimes were committed. *See Bell* v. *State*, 317 Ark. 289, 877 S.W.2d 579 (1994) (court upheld trial court's denial of Bell's pretrial motion to transfer case to juvenile court). Bell brings this appeal, raising three points for reversal. However, we do not reach all three because we must reverse for prejudicial error found as a result of this court's examination of the record required under

Ark. Sup. Ct. R. 4-3(h).[1] We consider that issue first.

Prior to trial, Bell moved to suppress any statements he gave as a result of an interrogation by law enforcement authorities on January 8, 1992. He alleged any statements attributed to him were involuntary and inadmissible. The record reveals that Sergeant Gary Allen and Officer John McCord interrogated Bell, but only McCord was present to testify at the suppression hearing. Bell's counsel objected to Allen's absence and counsel's inability to cross examine Allen. The prosecutor responded that he was not required to produce all of the state's witnesses, and anything Allen had to testify to at the hearing would already have been testified to by McCord. The trial court overruled defense counsel's objection, and after hearing the testimony of McCord, Bell, and Bell's father, the trial court denied Bell's motion to suppress.

■ Recently, in *Foreman v. State*, 321 Ark. 167, 901 S.W.2d 802 (1995), we cited the rule that, whenever an accused offers testimony that his confession was induced by violence, threats, coercion or offers of reward, the state has a burden to produce all material witnesses who were connected with the controverted confession or give an explanation for their absence. In determining whether a witness is "material," this court has stated that there must be some connection between the witness and the alleged acts of coercion or an opportunity to observe the alleged coercion. *Id.*

Here, Allen was undoubtedly a material witness because he took part in interrogating Bell and in obtaining statements from him. Bell testified that Allen acted as a "bad cop," and McCord as the "good cop" during Bell's interrogation. Bell further claimed Allen did most of the questioning, and it was during Allen's questioning when Bell asked for an attorney, and Allen said, "No." Additionally, Bell asserted Allen would get upset, hit the desk and wall, and when Bell asked for an attorney, Allen asked, "[W]hy did [you] need a lawyer, because [you're] guilty?"

■■ In sum, Bell's suppression motion raised the issue of the involuntariness of his statements to the police, and because Detective Allen was a material witness connected with those con-

---

[1] When the sentence is death or life imprisonment, the court must review all errors prejudicial to the appellant in accordance with Ark. Code Ann. § 16-91-113(a). *See also Fretwell v. State*, 289 Ark. 91, 708 S.W.2d 630 (1986).

troverted statements, it became the state's burden to produce Allen as a witness at the suppression hearing or to explain his absence. The state did neither. The prosecutor suggested McCord's and Allen's testimonies would be the same, but such a suggestion is purely self-serving. Bell should have been afforded the opportunity to cross examine both witnesses concerning their respective roles when questioning Bell. *See Williams v. State*, 278 Ark. 9, 642 S.W.2d 887 (1982). We would add that it is immaterial that Allen later testified at the trial because Ark. Code Ann. § 16-89-107(b) (1987) requires the trial judge to determine voluntariness by hearing evidence out of the presence of the jury. *Id*. We point out that the deficiency in the trial court's ruling does not in itself entitle Bell to a new trial. Instead, the cause is remanded for a new hearing on Bell's suppression motion. A new trial should be ordered only if the trial judge finds Bell's confession to have been involuntary. *Williams*, 278 Ark. 9, 14, 642 S.W.2d 887, 890 (supplemental opinion denying rehearing); *see also Moore v. State*, 309 Ark. 166, 828 S.W.2d 599 (1992); *Harris v. State*, 271 Ark. 568, 609 S.W.2d 48 (1980).

Because this case is remanded for a suppression hearing, we do not reach Bell's argument that the trial court erred in finding his custodial statements should have been suppressed, since the trial judge will be called upon to rule on that argument after he conducts the new hearing. We only emphasize that the error we find in this appeal relates only to the state's failure to meet its burden in producing Allen as a witness.

Bell raises two other points we still must address. The first asserts the trial court erred in denying his motion to change venue, and, second, he contends that the state unconstitutionally excluded African-Americans from the jury.

The thrust of Bell's venue argument is that he cannot obtain a fair trial or impartial jury in Arkansas County. He sets forth a number of reasons. First, he refers to another pair of murders that took place at Cloud's Grocery Store in Casscoe in 1975. Those murders were committed by Charles Pickens, who was eventually executed for the crimes on May 12, 1994 — five months prior to Bell's trial. Third, Bell introduced news articles and testimony describing all the above events, as well as the recent crimes with which Bell was charged. Plus, Bell offered articles relating a prison escape involving him and Sims, and an article reflecting the prosecutor's remark that the state expected problems in selecting a jury

for Bell's trial.

■ It is settled law that a change of venue should be granted only when it is clearly shown that a fair trial is not likely to be had in the county. *Gardner* v. *State*, 296 Ark. 41, 754 S.W.2d 518 (1988). The burden is on the defendant, and the decision of the trial judge will be upheld unless it is shown that there was an abuse of discretion in denying the motion. *Id.*

■ Initially, we mention Bell's eight uniform affidavits wherein eight county residents averred his or her respective belief that the minds of inhabitants of the county are so prejudiced against the defendant that a fair and impartial trial cannot be obtained. This court has held that those witnesses who state the appellant cannot receive a fair trial must be able to show that they either have a general knowledge as to the state of mind of the inhabitants of the whole county, or they are cognizant of prejudice existing throughout the whole county. *Id.* Further, affidavits that cite little or nothing beyond an affiant's own convictions that a fair trial is not possible are insufficient. *Bussard* v. *State*, 300 Ark. 174, 778 S.W.2d 213 (1989). Here, the affidavits submitted by Bell fail to meet the well-known case law principals set out above. Additionally, we note that only one of the eight affiants testified in court, and when doing so, countered her earlier averments. For example, as a witness, she said that she had not heard anyone express an opinion that Bell was guilty, and in fact she heard some people express the opinion they thought Bell was not guilty.

Bell presented three news media witnesses who related the numerous stories that were published or aired in the county, concerning the crimes committed not only by Bell and Sims, but also concerning Pickens's murders and execution. However, one news editor testified that his paper is published five days a week with a daily circulation of 3,900 out of a household count of 12,500, and, while his Tuesday paper is free to all households, only four articles regarding Bell, Sims, or Pickens had appeared in the Tuesday editions. An editor of another newspaper said that her paper is published only once a week with a circulation of 1,800. She also stated her paper produced only five articles concerning Bell, Sims or Pickens during the period from December 1992 through March 1994.

■■ Finally, Bell submits the fact that a number of the

veniremen were excused because they could not be impartial is reason to conclude a fair trial could not be obtained. The trial court, however, emphasized that the chief reason why the remaining veniremen were excused from duty was because of their beliefs regarding the death penalty, not pretrial publicity. The court has held that voir dire of the jury provides adequate safeguards against pretrial publicity, *Bussard*, 300 Ark. 174, 778 S.W.2d 213, and there can be no error in the denial of a change of venue if an examination of the jury selection shows that an impartial jury was selected and that each juror stated he or she could give the defendant a fair trial and follow the instructions of the court. *Gardner*, 296 Ark. 41, 754 S.W.2d 518. Here, twelve jurors were seated who indicated they could make an impartial decision based solely on the evidence. After carefully considering each of Bell's factors and the related evidence, we hold the trial court did not abuse its discretion in denying Bell's request for a change of venue.

In his next argument, Bell argues that because only one juror was African-American, the state unconstitutionally excluded African-Americans from the jury. Bell contends because the state used three of its five preemptory strikes against African-Americans and attempted to strike the only African-American who did serve on the jury, the state demonstrated a deliberate and systematic attempt to keep African-Americans off of the jury. Additionally, Bell claims the state was overeager in its efforts to obtain for-cause strikes against five African-Americans, and this is further evidence of an unconstitutional exclusion. Finally, Bell notes that not a single African-American venireman went unchallenged by the state. On the other hand, the state contends Bell has failed to establish a *prima facie* case, and it gave race-neutral reasons for its strikes.

■ *Batson* v. *Kentucky*, 476 U.S. 79 (1986), provides that the Equal Protection Clause forbids prosecutors from challenging potential jurors solely on the basis of race. In order to prevail under *Batson*, the defendant must first make a *prima facie* case that racial discrimination is the basis of a juror challenge. *Sims* v. *State*, 320 Ark. 528, 900 S.W.2d 508 (1995). A *prima facie* case may be established by: (1) showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose, (2) demonstrating total or seriously disproportionate exclusion of blacks from the jury, or (3) showing a pattern of strikes, questions, or statements by a prosecutor during voir dire. *Mitchell* v. *State*, 323 Ark. 116, 913

S.W.2d 264 (1996).

■ In the event the defendant is able to do so, the state has the burden of showing that the challenge was not based on race. Only if the defendant makes a *prima facie* case and the state fails to give a racially neutral reason for the challenge is the court required to conduct a sensitive inquiry. *Sims*, 320 Ark. 528, 900 S.W.2d 508. The standard of review for reversal of a trial court's *Batson* ruling is whether the court's findings are clearly against the preponderance of the evidence. *Id.*

In the present case, out of approximately seventy-to-eighty potential jurors, twelve veniremen who appeared were African-American. Those twelve veniremen were struck or accepted as follows: (1) Helen Hall raised her hand when the judge inquired whether any of the jury pool had a close relationship with Bell or either of the two victims. Hall stated she knew Bell's parents, and it would create a problem for her; she was excused for cause. (2) Linda Reeves stated she could not consider the death penalty as a punishment; based on the state's request, Reeves was excused for cause over Bell's objection. (3) Flora Wills stated her daughter had been represented by one of Bell's attorneys, and she knew Bell's parents. She also was equivocal on whether she could impose the death penalty on one who was not the triggerman. The court refused to strike Wills for cause, and the state used its first preemptory strike. (4) Floid Lavine stated he had known the Bells for years, had coached Bell in peewee ball, and had been in the Bells's home, and that he would hold the prosecutor to a higher standard in proving Bell guilty than proving a stranger guilty. Lavine was excused for cause on the state's request and over Bell's objection. (5) Betty Chambers stated she did not think she could live with imposing the death penalty on someone, and was excused for cause upon the state's request and over Bell's objection. (6) Carnetta Holloway was selected as juror no. 6. (7) Charles Higgins was excused for cause because he had experienced two strokes which prevented him from thinking fast; Bell did not object. (8) Amanda Taylor stated she could not consider imposing the death penalty, and was excused for cause; Bell did not object. (9) James Copprell stated he was close friends of the Bells and did not think he should serve on the jury. Copprell was excused for cause, and Bell did not object. (10) Darlene McNeil stated she did not know whether she could consider the death penalty as punishment, but the court refused to

excuse her for cause. Over Bell's objection, the state used a preemptory challenge to exclude McNeil. (11) Felicia Geans stated she could not impose the death penalty, and was excused for cause; Bell did not object. (12) Wilma Bradford stated she could not impose the death penalty, and was excused for cause; Bell did not make a specific objection to her exclusion.

The record reflects that the state initiated or joined in motions to excuse at least twenty-three potential jurors, and as determined by the trial judge, most of the exclusions, albeit African-American or otherwise, were based on the fact many of the veniremen could not impose the death penalty. In sum, even if a *prima facie* case had been shown to exist, we hold the foregoing reasons given for excluding African-Americans in this case were clearly race neutral. Consequently, we hold no *Batson* error was shown.

For the reasons above, we uphold the trial court's rulings pertaining to Bell's venue and *Batson* issues, but reverse and remand for a suppression hearing.