Marco Kodell PROWELL *v.* STATE of Arkansas

CR 95-1007 921 S.W.2d 585

Supreme Court of Arkansas
Opinion delivered May 6, 1996
[Petition for rehearing denied June 10, 1996.*]

*DUDLEY, J., not participating.

*McLean Law Firm*, by: *William A. McLean*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y Gen., Sr. Appellate Advocate for appellee.

ANDREE LAYTON ROAF, Justice. Appellant Marco Kodell Prowell appeals his conviction of capital murder and aggravated robbery and sentence of life imprisonment without parole. Prowell challenges the sufficiency of the evidence and the trial court's failure to suppress identification testimony and to grant his objection to the state's peremptory strikes based on *Batson v. Kentucky*, 476 U.S. 79 (1986). We affirm.

At approximately 8:00 p.m. on March 25, 1994, two men entered Andre's Cuisine in the Hillcrest area of Little Rock. One of the men approached Andre Simon, the owner of the restaurant, and pulled a gun. Simon and the assailant struggled; Simon was knocked to the floor and shot in the back. After shooting Simon, the assailant turned toward Richard Wilson, the manager of the restaurant, and demanded that he open the safe. Wilson opened the safe and handed him a bag containing about $400.00; the two men then fled the restaurant. Simon died as a result of the gunshot wound.

At trial, Richard Wilson identified appellant Marco Prowell as the person who shot Simon. Bill Byrd, a patron of the restaurant, identified Prowell as one of the men who entered the restaurant. Jeff Gilger, also a patron of the restaurant, testified that he saw Prowell enter the restaurant shortly before Simon was shot, but he did not see a gun.

## 1. Sufficiency of the evidence

Prowell first contends that because of overly suggestive pretrial identification procedures and the unreliable nature of the identification by Richard Wilson, his motions to suppress Wilson's in-court identification and for a directed verdict should have been granted. Prowell submits that the motion for directed verdict should have been granted because, without the erroneously admitted iden-

tification testimony, the evidence was insufficient to sustain his conviction. Although Prowell combines his challenge to the sufficiency of the evidence with his challenge to the pretrial identification procedures, the preservation of an appellant's right to freedom from double jeopardy requires that we review the sufficiency of the evidence prior to examining trial error. *Passley v. State*, 323 Ark. 301, 915 S.W.2d 248 (1996). Consequently, we address Prowell's challenge to the sufficiency of the evidence prior to considering his other assignments of trial error. In determining the sufficiency question, we disregard any alleged trial errors. *Young v. State*, 316 Ark. 225, 871 S.W.2d 373 (1994).

 On appeal, we determine whether the evidence in support of the verdict is substantial. Substantial evidence is that which is forceful enough to compel reasonable minds to reach a conclusion one way or another. *Young v. State, supra.* In a criminal case, we review the evidence in the light most favorable to the state, and consider only that evidence which supports the guilty verdict. *Id.* In the instant case, Robert Wilson identified Prowell as the assailant who shot Andre Simon. His credibility is for a jury, not an appellate court, to determine. *Larimore v. State*, 317 Ark. 111, 877 S.W.2d 570 (1994). Further, the uncorroborated testimony of one state's witness is sufficient to sustain a conviction. *Galvin v. State*, 323 Ark. 125, 912 S.W.2d 232 (1996); *Gray v. State*, 318 Ark. 601, 888 S.W.2d 302 (1994). Thus, the evidence is sufficient to sustain Prowell's conviction.

### 2. Suppression of identification testimony

Prowell also asserts that the trial court erred in failing to suppress the in-court identification by Richard Wilson. Prior to trial, Prowell moved to suppress all identification testimony. He contended that both pretrial and in-court identifications should be suppressed because the pretrial photographic lineup procedures were suggestive and would taint and render unreliable any subsequent in-court identification.

 We will not reverse a trial court's ruling on the admissibility of an in-court identification unless the ruling is clearly erroneous under the totality of the circumstances. *Mills v. State*, 322 Ark. 647, 910 S.W.2d 682 (1995); *Chenowith v. State*, 321 Ark. 522, 905 S.W.2d 838 (1995); *Hayes v. State*, 311 Ark. 645, 846 S.W.2d 182 (1993). In determining whether an in-court identification is

admissible, we look first at whether the pretrial identification proce-
dure was unnecessarily suggestive or otherwise constitutionally sus-
pect; it is the appellant's burden to show that the pretrial identifica-
tion procedure was suspect. *Mills, supra; Hayes, supra.*

■■ A pretrial identification violates the Due Process
Clause when there are suggestive elements in the identification
procedure that make it all but inevitable that the victim will identify
one person as the culprit. *King* v. *State,* 323 Ark. 558, 916 S.W.2d
725 (1996); *Chenowith* v. *State,* 321 Ark. 522, 905 S.W.2d 838
(1995). Even when the process is impermissibly suggestive, the trial
court may determine that under the totality of the circumstances
the identification was sufficiently reliable for the matter to be sub-
mitted to the jury, and then it is for the jury to decide the weight
the identification testimony should be given. *King, supra; Che-
nowith, supra.* In determining reliability, the following factors are
considered: (1) the prior opportunity of the witness to observe the
alleged act; (2) the accuracy of the prior description of the accused;
(3) any identification of another person prior to the pretrial identifi-
cation procedure; (4) the level of certainty demonstrated at the
confrontation; (5) the failure of the witness to identify the defend-
ant on a prior occasion; and (6) the lapse of time between the
alleged act and the pretrial identification procedure. *King, supra;
Mills, supra.*

In Prowell's case, the trial court conducted a suppression hear-
ing to determine the admissibility of Richard Wilson's identification
testimony. The following evidence was presented at this hearing.
On the evening of the incident, March 25, 1994, Wilson provided a
statement to the police in which he described the person who shot
Simon as a black man, about 185 or 190 pounds, clad in a jacket
and oversized clothes which made him appear overweight. He
stated that the second assailant was heavier than the gunman.

On March 27, 1994, Wilson viewed a photographic lineup of
six individuals. Prowell's photograph was not included. He picked
one of the individuals as a "look-alike" of the person who shot
Simon. At approximately 1:50 a.m. on March 31, Wilson again
went to the police station to view a photographic lineup which
included a picture of Prowell. Wilson testified that he was disori-
ented that night because he had not slept in four or five days.
Wilson did not select anyone from this lineup.

At approximately 3:22 p.m. on March 31, Wilson viewed another photographic lineup which included the picture of Prowell. He picked one of the men as a look-alike of the second assailant — not the person who shot Simon.

Wilson viewed a final photographic lineup on April 8, 1994. However, he testified that prior to the April 8 lineup, he saw a newspaper photograph of Prowell and two other men all clad in orange suits; they were identified as involved in the Simon shooting. Wilson testified that he recognized Prowell in this photograph as the person who shot Simon. He did not notify the police that he had seen the gunman's picture in the newspaper until he arrived at the police station on April 8.

On April 8, Wilson viewed the same photographs shown to him on March 31. Wilson selected the photograph of Prowell, but he stated that he "thought the picture didn't look like Mr. Prowell" and that the newspaper picture of Prowell was significantly different. Wilson testified that the newspaper picture was a full body shot, while the police photograph showed an individual looking directly into the camera with a dazed expression, and that the light in the police photograph "washed the face out."

We cannot say that it was all but inevitable that Wilson would identify Prowell because of the newspaper photograph. *See King v. State, supra.* A suspect was identified under similar circumstances in *Van Pelt v. State,* 306 Ark. 624, 816 S.W.2d 607 (1991). There, the witness was present at the police station and saw Van Pelt as he arrived in custody. We noted that there was no evidence suggesting that the police brought Van Pelt to the station to facilitate an identification. The witness made his initial identification spontaneously and before Van Pelt was taken inside the building; the witness could not have known for certain that Van Pelt was even the suspect in the crime. In the instant case, there is also no suggestion that the police were involved in any way with Wilson's viewing of the newspaper photographs. Further, although three men were depicted in the newspaper photograph as suspects in the Simon shooting, Wilson specifically identified Prowell as the one who shot Simon.

Even assuming the pretrial identification procedure was impermissibly suggestive, Wilson's identification was sufficiently reliable. *See Chenowith, supra.* Wilson testified that he viewed the person

who shot Simon for approximately forty-five seconds during the incident and that he was within a few feet of the assailant at the time of the shooting. The shooter was within approximately two feet when he held the gun on Wilson. Although there was some confusion about which of the two assailants was heavier, Wilson informed the police that the gunman weighed 185 or 190 pounds; according to the arrest records, Prowell weighs 160 pounds.

Wilson never identified any other person as the individual who shot Simon. He advised the police that if he saw the person who shot Simon, he could identify him; he did in fact identify Prowell as the gunman. Further, Wilson testified that his identification was based upon his independent recollection of the events that happened on the evening of the murder. Although Wilson did not identify Prowell during the March 31 photographic lineups, he explained that the newspaper photograph was significantly different than the line-up photograph and that the police photograph was not a good likeness of Prowell.

■ We cannot say, under the totality of the circumstances, that the trial court was clearly erroneous in permitting the in-court identification to proceed.

Prowell also contends that the photograph which Richard Wilson and Jeff Gilger viewed during the photographic lineups was obtained in violation of his constitutional rights and that their identification testimony was therefore inadmissible as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471 (1963); *see also, Burnett v. State*, 295 Ark. 401, 749 S.W.2d 308 (1988).

Prowell asserts that the photograph was obtained as a result of his unlawful arrest on March 31, 1994. At a separate pretrial suppression hearing, Detective Ronnie Smith testified that when Prowell was located at a friend's apartment on the evening of March 30, 1994, he was a suspect, but the police did not have probable cause to arrest him at that time. Smith stated that he told Prowell that his name had come up in connection with the Simon homicide and that he just wanted to ask him a few questions about the matter. Smith further testified that he told Prowell that his cooperation was voluntary, but Smith acknowledged that he did not specifically advise Prowell that he was under no legal obligation to accompany the officers to the police station, as required by A.R.Cr.P. Rule 2.3.

Prowell's testimony concerning his arrest was at odds with that

of the officer. Prowell testified that while he was standing in the parking lot of the apartments where he lived, six or more plain clothes police officers jumped out of two vehicles with guns drawn, ordered him to get down, handcuffed him, placed him in one of the cars, and took him to the police station. The photograph of Prowell used in the lineups was taken after he arrived at the station. Prowell further testified that no one told him that he did not have a legal obligation to accompany the officers to the police station.

 In *Burnett v. State, supra*, this Court quoted the test for whether one has been seized from *United States v. Mendenhall*, 446 U.S. 544 (1980):

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

In determining that Burnett was seized at his home in violation of the Fourth Amendment, we noted that officers did not comply with the rule of criminal procedure which requires that a person be informed he is free not to accompany the officer if the officer does not have a warrant. *See* A.R.Cr.P. Rule 2.3. Burnett was not told he could stay at home; he was simply told to get his clothes on and come to the station.

Arkansas Rule of Criminal Procedure 2.3, Warning to Persons Asked to Appear at a Police Station, provides:

> If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, *he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.*

(Emphasis added.) Here, Smith testified that he never specifically informed Prowell that he was under no legal obligation to accom-

pany the officers and that he was not even aware of Rule 2.3 at the time of Prowell's arrest. Smith merely stated that he advised Prowell that his cooperation was voluntary and that he was only a suspect. This does not comply with the requirements of Rule 2.3. *See Addison v. State*, 298 Ark 1, 763 S.W.2d 566 (1989).

■ However, Prowell has suffered no prejudice from the photograph taken at the police station. Wilson was unable to identify Prowell from this photograph in the photographic line-ups conducted on March 31. Wilson instead identified Prowell as the shooter from the newspaper photograph, and he further testified that his in-court identification of Prowell was based upon his independent recollection of the events that happened on the evening of the robbery and murder.

### 3. Peremptory challenges

■ For his final argument, Prowell asserts that the state's use of peremptory challenges to excuse three blacks from the jury violated the Equal Protection Clause of the Fourteenth Amendment. *See Batson v. Kentucky* 476 U.S. 79 (1986). The procedures to be followed when a *Batson* objection is raised are well established:

> First, the defendant must make a prima facie case that racial discrimination is the basis of a juror challenge. In the event the defendant makes a prima facie case, the State has the burden of showing that the challenge was not based upon race. Only if the defendant makes a prima facie case and the State fails to give a racially neutral reason for the challenge is the court required to conduct a sensitive inquiry.

*Mitchell v. State*, 323 Ark. 116, 913 S.W.2d 264 (1996); *Heard v. State*, 322 Ark. 553, 910 S.W.2d 663 (1995). Further, this Court has stated that a prima facie case may be established by: (1) showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose, (2) demonstrating total or seriously disproportionate exclusion of blacks from the jury, or (3) showing a pattern of strikes, questions, or statements by a prosecuting attorney during voir dire. *Id.* The standard of review for reversal of a trial court's *Batson* ruling is whether the court's findings are clearly against the preponderance of the evidence. *Id.*

During voir dire, the state exercised one of its peremptory challenges to strike David King, a black man. At the time King was

excused, two persons had been selected to sit on the jury panel. Prowell asked that the state be required to enunciate its reasons for the strike. The prosecutor responded that six prospective jurors had been questioned and one black person was sitting on the panel. The prosecutor stated that King, in answering the questions concerning the death penalty, had "some pause in considering that issue," and that King had discussed his Christian conviction, including grace and mercy, and stated that he could not consider the death penalty for an accomplice. The prosecutor asserted that he believed King's religious conviction was such that he could not consider the death penalty.

The state also used a peremptory challenge to strike Alberta Maxwell, a black woman. Once again, Prowell asked that the state provide a reason. In response, the state indicated for the record that five jurors had been selected — three black women and two white men. As to Ms. Maxwell, the state explained that when asked about the burden of proof on capital murder cases, she paused a very long time and gave several answers that indicated she would hold the state to a higher standard.

Finally, the state exercised a peremptory challenge to strike Verline Hardaway, a black woman. Prowell then made a *Batson* objection and asked that the state provide a reason. The state submitted that although Hardaway eventually said she could probably consider the death penalty, she initially stated that she had "deeply held personal beliefs that would keep her from considering the death penalty." Further, the prosecutor submitted that Ms. Hardaway said several times that in a death-penalty case she would want to be convinced beyond all doubt. The trial court accepted the state's explanations and upheld all three strikes.

■ Although the defendant must first make a prima facie case that racial discrimination is the basis of a juror challenge, here, the prosecutor volunteered explanations for the challenges; the trial court made no rulings on whether a prima facie case was made. In *Hernandez v. New York*, 500 U.S. 352 (1991), the Court stated that once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. *Id.*; *see also Sims v. State*, 320 Ark. 528, 900 S.W.2d 508, (1995).

■ The standard by which we review the trial court's evaluation of the sufficiency of the prosecutor's explanation is whether those findings are clearly against a preponderance of the evidence. *Pacee v. State*, 306 Ark. 563, 816 S.W.2d 856 (1991). The prosecutor's explanation need not rise to the level justifying the exercise of a challenge for cause. *Id.*

■ Here, the prosecutor's explanations were clearly based on something other than race and without anything more, the reasons he offered in striking the jurors must be deemed race neutral. *See Reams v. State*, 322 Ark. 336, 909 S.W.2d 324 (1995). We have accepted as racially neutral an explanation that the prosecutor felt he "had gotten some mixed signals about what [a prospective juror] would require in terms of the State's proof." *Sims v. State*, 320 Ark. 528, 900 S.W.2d 508 (1995). Under the circumstances, we cannot say that the trial court's *Batson* rulings were clearly against the preponderance of the evidence.

### 4. Ark. Sup. Ct. R. 4-3(h)

The record has been examined in accordance with Arkansas Supreme Court Rule 4-3(h), and there were no rulings adverse to Prowell which constituted prejudicial error.

Affirmed.