A.B. ALLEN *v.* STATE of Arkansas

CR 96-1099 939 S.W.2d 270

Supreme Court of Arkansas
Opinion delivered February 17, 1997

[Supplemental Opinion on Denial of Rehearing
delivered March 17, 1997.*]

---

\* Glaze, J., concurs. Newbern, J., dissents.

*John Wesley Hall, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *O. Milton Fine II*, Asst. Att'y Gen., for appellee.

RAY THORNTON, Justice. The Mayor of the City of Gould, appellant A.B. Allen, was charged with two counts of "prohibited actions by a municipal official" under the provisions of Arkansas

Code Annotated § 14-42-108(a)(1) and (b)(1) in that he: (1) received municipal services from the City without paying for such services at the same rate and in the same manner that the general public pays for such services, and (2) furnished persons within the City water service without requiring payment at the regular rates and in the usual manner. Upon conviction, appellant was fined $50.00 on each count. Pursuant to § 14-42-108(c)(2), the trial court removed him from the Gould mayoralty. On appeal, the appellant contends that the evidence was insufficient to convict him, and that the provision removing him from office and making him ineligible to hold municipal office denies him equal protection of the law. We affirm the convictions, and also the removal from office and ineligibility to hold office, which resulted from the convictions.

### Count I:

The first count against the appellant was brought under Ark. Code Ann. § 14-42-108, which provides:

> It shall be unlawful for any official or employee of any municipal corporation of this state to receive or accept any water, gas, electric current, or other article or service from the municipal corporation, or any public utility operating therein, without paying for it at the same rate and in the same manner that the general public in the municipal corporation pays therefor.

*Id.* § 14-42-108(a)(1).

Ms. Sherry Taylor testified at trial that during 1994 she was the Water and Sewer Clerk, handling both billing and deposits. She testified that water customers living in the City who were connected to the sewer system were required to pay the minimum water bill, and the minimum sewer bill. If a customer used no water, that customer would receive a minimum bill ($7.00) for water and a minimum bill ($10.50) for sewer, plus a $5.00 charge for sanitation. She stated that the exception to this rule was for people outside the city limits. Arkansas State Police Sergeant Gary Allen conducted an investigation of the allegations, and he testified that there were individuals outside the Gould city limits who were paying only for water, but they were not hooked up to the Gould

sewage system. From the evidence, it appears that members of the general public in Gould who were connected to the sewer system were required to pay for sewer and sanitation service in order to obtain water service.

Robert Stephens, a 1994 member of the Gould City Council, testified a person living in Gould and connected to the sewer system would have a minimum bill of $10.94 each month for sewer services and $7.00 for water services. Stephens further testified that as a water commissioner, he was aware of only one person who did not pay the sewer minimum, despite being hooked up to the sewage system and the water system, and identified that person as appellant, who was not paying the sewer minimum.

Appellant testified that he and his wife owned a store in Gould and that water has always been hooked up to the store, but that he stopped paying for the sewer service to the store when it closed in August or September of 1992. This was confirmed by Ms. Taylor's testimony that appellant had told her that since the store was closed, to leave the water charge on the bill but to take the sewer charge off. During her direct examination in the trial, Ms. Taylor responded as follows to a question whether this was the right thing to do: "Well, I understood that if you stayed within the city limits and you were connected to sewer, you were required to pay a sewer bill." The testimony that appellant gave the order to remove his store from the billing requirement for sewer service without disconnecting the store from the sewer line is evidence that he used his office to obtain preferential treatment not available to the general public.

■■ In reviewing the sufficiency of the evidence, we will affirm if there is any substantial evidence to support the verdict. *Wilson v. State*, 320 Ark. 707, 709, 898 S.W.2d 469, 470 (1996). The evidence, whether direct or circumstantial, must be of sufficient force that it will, with reasonable and material certainty and precision, compel a conclusion one way or another. *Kilpatrick v. State*, 322 Ark. 728, 733, 912 S.W.2d 917, 920 (1995). This court does not attempt to weigh the evidence or pass on the credibility of witnesses. That duty is left to the trier of fact. *Mann v. State*, 291 Ark. 4, 7-8, 722 S.W.2d 266, 268 (1987). The jury is free to

believe the testimony of the State's witnesses and to discount that of appellant and his witnesses. *Jones v. State*, 326 Ark. 61, 64, 931 S.W.2d 83, 85 (1996).

 We find sufficient evidence to support the guilty verdict on the first charge of receiving services without paying at the same rate and in the same manner as the general public.

*Count II:*

The second count was brought under Ark. Code Ann. § 14-42-108 which provides:

> It shall be unlawful for any city official or employee of any municipal corporation in this state to furnish or give to any person, concerns, or corporations any property belonging to the municipal corporation, unless payment is made therefor to the municipal corporation at the usual and regular rates, and in the usual manner, except as provided in subsection (a) of this section.

*Id.* § 14-42-108(b)(1).

Appellant was charged with violations of this statute for his actions in adjusting bills of persons using water and sewer services. The appellant does not admit making all of the adjustments reflected in the testimony of Ms. Taylor, Officer Allen, or Mr. Stephens, and contends that the adjustments were made to offset faulty meters or leaky water lines. In considering the appeal on the issue of insufficient evidence, we look at the record to determine whether there is substantial evidence.

A procedure for reviewing consumer complaints about bills for services was established by Gould City Ordinance No. 081793, which provides that any user who believes his user charge is unjust and inequitable may make written application to the Gould City Council requesting review of his user charge. The ordinance further provides authority for the City Council to recompute user charges and make them applicable to the next bill. There is no indication that this procedure was used to adjust bills, although Ms. Taylor does indicate that one system-wide reduction of bills ordered by the appellant in July of 1994 had been approved by the City Council. There was no Council approval of the earlier

adjustments made in response to user complaints during the month of February. Ms. Taylor testified that she could not remember how many bills were reduced at that time, but she read her note on the last page of the printout that "Adjustments was [sic] made on all customers, authority per Mayor Allen, with late charges taken off, minimums on past due and current bills will remain the same." She then indicated that she had signed her name to this note. Ms. Taylor further testified that she documented other adjustments ordered by appellant by noting on the back of the bill stubs "per Mayor Allen." She identified the bill stubs in a booklet as reflecting adjustment in bills ordered by appellant, and said that she had documented the number of bills actually adjusted during 1994, but left the documentation behind when she was transferred to the police department. When responding to the question, "[D]id you talk to the mayor about those adjustments [during the period of time these adjustments were made]?", Ms. Taylor replied: "I have — I remember telling him one time that if the meter was read correctly, and I think I told him that I thought that they should be billed for whatever the amount was." Ms. Taylor also testified that appellant instructed her not to send out bills on election day.

Sergeant Gary Allen testified that the prosecuting attorney directed him to investigate a complaint by a citizen's group that appellant was not paying for water and sewer at the regular rates and that appellant, without authority to do so, was adjusting or dismissing payments due by others on their water and sewer bills. Officer Allen testified that he pulled several bills for examination and found nine bills from the month of September, October, and November that showed adjustments to lower the bills. On cross-examination, the following exchange occurred:

> Q: Mr. Allen was elected the last of November of '94, was he not?
>
> A: I believe that is correct.
>
> Q: And these issues came up during election, did they not?
>
> A: They was . . . yes, sir, it was during that period of time. That was the —— the gist of the complaint, that the water bills were being adjusted in exchange for votes.

Mr. Stephens testified that he had reviewed the documents presented in evidence, and had prepared a list of some of the water bills which had been reduced. This list was received into evidence as State's Exhibit 5. The names on the list were drawn from bill stubs which had been marked by Ms. Taylor as being reduced by the mayor. Exhibit 5 disclosed twelve accounts that were reduced between August 31, 1994, and October 31, 1994. Of the twelve accounts, eight bills ranging from $78.70 down to $45.83 were reduced to bills for minimum usage (approximately $23.75). The remaining four accounts, reflecting bills ranging from $171.33 to $76.60, were adjusted by a total reduction of $260.62, with an aggregate reduction for all twelve accounts of $549.18.

We find that there is sufficient evidence to sustain a conviction on the second charge.

### Removal From Office:

We turn to the issue whether the removal from office and the ineligibility to thereafter hold municipal office, which resulted from the conviction, denied to appellant the equal protection of the laws. Arkansas Code Annotated § 14-42-108 provides as follows:

> Conviction shall ipso facto remove the official or employee from the municipal office or position held by him and shall render him ineligible to thereafter hold any office or position under, or in connection with, the municipal corporation.

*Id.* § 14-42-108(c)(2).

A similar provision applicable to all public offices in the state is found in art. V, § 9 of the Arkansas Constitution, which renders an official found guilty of an "infamous crime" ineligible for holding office in perpetuity.

Appellant contends that the provisions for removal and ineligibility established for municipal officers are unconstitutional because they deny to appellant the equal protection of the laws in that county officials are not subject to the same provisions. To meet his burden, appellant must show that the disparate statutory treatment of county and city officers is arbitrary and capricious

and is completely devoid of any legitimate purpose. *Reed v. Glover*, 319 Ark. 16, 22, 889 S.W.2d 729, 732 (1994).

In determining whether a statute is an unconstitutional denial of equal protection, we are guided by well-established principles. If there is any basis for a classification, it will be upheld in the face of an equal protection challenge. *Cook v. State*, 321 Ark. 641, 648, 906 S.W.2d 681, 685 (1995). If the court finds that the act is rationally related to any legitimate objective of state government under any reasonably conceivable state of facts, the statute will be upheld. *Id.* Upon review, this court merely considers "whether any rational basis exists which demonstrates the possibility of a deliberate nexus with state objectives, so that the legislation is not the product of utterly arbitrary and capricious government purpose and void of any hint of deliberate and lawful purpose." *Id.* (citing *Reed v. Glover*, 319 Ark. 16, 889 S.W.2d 729 (1994)).

In reviewing the constitutionality of a statute, we presume that the statute is constitutional, and the party challenging the constitutionality has the burden of proving otherwise. We resolve all doubts in favor of constitutionality. *Misskelley v. State*, 323 Ark. 449, 470, 915 S.W.2d 702, 713 (1996), *cert. denied*, 117 S.Ct. 246 (U.S. 1996); 117 S.Ct. 246 (1996); *Reed v. Glover*, 319 Ark. at 21, 889 S.W.2d at 731.

In considering the effect of provisions limiting access to public office, we first examine the issue of what combination of rights, privileges, duties, and responsibilities are included in holding office.

Long ago this court considered this issue in holding that the Governor was not required to issue a commission to the person receiving the largest number of votes for sheriff, when that person was in violation of provisions relating to the accountability for public funds. *Taylor v. The Governor*, 1 Ark. (1 Pike) 21 (1837). In *Taylor*, we stated:

> The applicant has neither been dispossessed of his freehold nor in any manner deprived of his rights, privileges, or property, nor has he been denied the law of the land or judgment of his PEERS, or the freedom or equality of elections. All these privileges he pos-

sesses in as ample a manner and in as full a degree as any other citizen. The constitution simply withholds from him public trust which depended upon his own volition or will, provided he complied with the condition annexed to the office.

*Id.* at 27.

██ Holding public office is a political privilege and not a civil right. *State ex rel. Attorney General v. Irby*, 190 Ark. 786, 795, 81 S.W.2d 419, 422 (1935). In *Irby*, we considered whether a convicted felon who had received a full and complete Presidential pardon should thereafter be eligible to hold an office of trust or profit, and stated:

> To hold that these safeguards and restrictions as they appear in our Constitution were promulgated as a punishment against the banished class cannot be justified by interpretation. Such was neither the intent nor the purpose of the framers of our Constitution. The clear and unmistakable intent and purpose was to safeguard the welfare of the State against invasions as is now thrust upon it. Evidently it was the paramount thought that one who had been convicted for embezzling public funds should not again be trusted with their use, and we are unwilling to admit lack of wisdom in the framers of our Constitution in this regard.

*Id.*, 81 S.W.2d at 423. The court deferred to the intent of the framers in protecting the public against violations of the public trust, and it found that the provisions barring the official from holding public office were safeguards rather than punishments and did not violate any constitutional right. *Id.* at 794-95, 81 S.W.2d at 422-23. The court stated that ineligibility to hold office did not deny the county official's rights or personal liberty, but instead withheld an honorable privilege. *Id.* at 796, 81 S.W.2d at 423.

██ Based on these principles, we note that the statute excluding appellant from holding office in the municipality is not punitive in nature, but only restricts appellant's privilege of holding municipal office to protect the public from a recurrence of the abuses which led to the convictions.

██ With the privilege of holding public office come certain responsibilities and power unique to the specific office. A public office is a public trust, and funds officially received are trust

funds. *Brewer v. Hawkins*, 248 Ark. 1325, 1328, 455 S.W.2d 864, 866 (1970). By statute, city officials are given "unlimited authority" to "manage, operate, improve, extend, and maintain" municipal waterworks. Ark. Code Ann. § 14-234-306(a) (1987). The convictions that led to appellant's removal involved an abuse of power that the public specifically entrusted to municipal officials. There is a nexus between the grant of power and the protection provided to the public. We find that coupling an extraordinary statutory grant of power to a municipal officer with a provision of ineligibility to hold office if that power is abused is rationally related to a legitimate state purpose.

 We hold that the provision excluding appellant from holding office again in the same city is not unconstitutional.

Affirmed.

NEWBERN, J., dissents.

DAVID NEWBERN, Justice, dissenting. For over 150 years, we have heeded the principle that criminal statutes are to be construed strictly. As we said in *Hughes v. State*, 6 Ark. 131, 134 (1845), this principle of statutory construction "is founded alike upon policy as well as humanity, designed for the protection of the citizen, unless he is clearly charged, and proven guilty, of a violation of a positive enactment of law." In *Weber v. State*, 250 Ark. 566, 570, 466 S.W.2d 257, 260 (1971), we said that "[i]t is so firmly established as to need no citation of authority that criminal statutes are strictly construed," and we said that application of this principle requires that "nothing . . . be added or taken away from the precise or express language" of a statute.

More recently, we wrote that, "[o]n appellate review, we strictly construe criminal statutes, resolving any doubts in favor of the defendant," *Graham v. State*, 314 Ark. 152, 157, 861 S.W.2d 299, 302 (1993), and taking "nothing . . . as intended which is not clearly expressed." *Hales v. State*, 299 Ark. 93, 94, 771 S.W.2d 285, 286 (1989) (citation and internal quotation marks omitted). *See also United States v. Resnick*, 299 U.S. 207, 209 (1936) ("Statutes creating crimes are to be strictly construed in favor of the accused; they may not be held to extend to cases not covered by the words used.").

The majority opinion violates this "cardinal rule of construction of criminal statutes." *Hales, supra.* Given the language of Ark. Code Ann. §§ 14-42-108(a)(1) and (b)(1) (1987) and our duty to construe that language strictly, it is impossible to conclude that Mr. Allen committed the *actus reus*, or "the guilty act," of the offenses contained in these provisions.

### 1. Count 1

The majority correctly identifies the standard by which we must determine whether the evidence was sufficient to support the conviction under § 14-42-108(a)(1). We will affirm a guilty verdict if it is supported by substantial evidence, which, as we have said, is evidence that would permit the jury to reach its conclusion "without resorting to speculation or conjecture." *Echols v. State,* 326 Ark. 917, 938, 936 S.W.2d 509 (1996).

The State, however, was required to prove that Mr. Allen

(1) received or accepted any water, gas, electric current, or other article or service from the municipal corporation, or any public utility operating therein,

(2) without paying for it at the same rate and in the same manner that the general public in the municipal corporation pays therefor.

### a. The "received or accepted" element

Although the evidence clearly shows that Mr. Allen did not pay for sewer or sanitation services, where is the evidence that he "received or accepted" those particular services? The terms of § 14-42-108(a)(1) do not impose criminal liability on an individual for paying for a particular service at a different rate or in a different manner unless there is proof that the individual is first receiving or accepting that particular service.

The State proved only that Mr. Allen "received or accepted" the water service, and no one disputes that he paid the monthly minimum charge for that particular service. There is no proof, however, that he "received or accepted" any service for which he did not make payment. Not a single witness testified that he (1)

drew from a faucet any water that had been treated or purified in the sewer system; (2) contributed wastewater to the sewer system for purification or other treatment; (3) generated garbage for collection by sanitation personnel; or (4) otherwise received or accepted any form of sewer and sanitation services. In sum, there was no evidence that he committed the "wrongful deed which renders the actor criminally liable" under § 14-42-108(a)(1), BLACK'S LAW DICTIONARY 36 (6th ed. 1990), and his conviction should therefore be reversed.

If it is the view of the majority that the conviction is supported by the showing that Mr. Allen received *water service* without paying for sewer and sanitation services, the statute is being badly misconstrued. The proscribed conduct is receiving or accepting a particular municipal service without paying for it at the same rate and in the same manner that the general public pays for that particular service. If an individual does not receive or accept that particular service, and he therefore does not pay for it, he does not become criminally liable under the terms of § 14-42-108(a)(1) by receiving or accepting an entirely *different* service for which payment is made in the usual manner.

If it is the position of the majority that Mr. Allen committed the offense by maintaining a connection to the sewer system and failing to pay the minimum sewer fee, the majority again fails in its construction of the statute. While Mr. Allen, by receiving the water service and by maintaining a connection to the sewer system, had the *means* of receiving or accepting sewer services for which he had not made payment, that is not proscribed by the statute.

It is conceivable that the Mr. Allen might, one day, consume water treated in the sewer system or contribute wastewater to the sewer system for treatment. In fact, he indicated that he had retained water services at his store so that he could periodically flush out the building's pipes in order to keep them from rusting. If there were any evidence whatever that he had acted upon that intention, that would constitute evidence that he was in violation of the statute unless he paid for the sewer service at the same rate

and in the same manner as everyone else. There is no such evidence.

Section 14-42-108(a)(1) requires proof of actual receipt or acceptance of a particular service. Proof that Mr. Allen had the means of receiving or accepting a particular service or that he intended to receive or accept it does not suffice to sustain a conviction under this statute. "One basic premise of Anglo-American criminal law is that no crime can be committed by bad thoughts alone. Something in the way of an act, or of an omission to act where there is a legal duty to act, is required too." LeFave & Scott, Criminal Law § 3.2, at p. 196 (2d ed. 1986). There simply was no evidence that Mr. Allen *acted* so as to utilize his sewer connection or his water service to receive or accept sewer service.

Acknowledging that "a penal statute must not be construed so strictly as to defeat the obvious intent of the legislature," *Thomas v. State*, 315 Ark. 79, 80, 864 S.W.2d 835, 836 (1993), there can be no question that the General Assembly only intended to punish municipal officials for receiving or accepting a municipal service without paying for it at the same rate and in the same manner as the general public pays for the service. There is no other way to construe this provision. Because the State did not satisfy this critical element of the offense, the conviction under § 14-42-108(a)(1) should be reversed.

b. *The "paying . . . at the same rate and in the same manner"*
*element*

Reversal is also required on account of the State's failure to produce substantial evidence that Mr. Allen paid for municipal services in a manner contrary to the general public's manner of paying for them. Under § 14-42-108(a)(1), the State was obligated to show that Mr. Allen failed to pay for received or accepted services "at the same rate and in the same manner" as the general public pays for such services.

According to the majority, the testimony of Sherry Taylor and Robert Stephens was sufficient to prove that Mr. Allen "used his office to obtain preferential treatment not available to the gen-

eral public." They testified that, in their opinion, any customer who resided within the city limits of Gould and was connected to the sewer system was required to pay the minimum sewer fee. The testimony cited by the majority suggests that Mr. Allen was the only person in the City who received water service and was connected to the sewer system who did not pay a minimum sewer fee.

To the contrary, the testimony of Ms. Taylor and Mr. Stephens is not substantial evidence that Mr. Allen's manner of paying for municipal services and the rate at which he paid for services were contrary to those of the general public. Each witness, through his or her work in city government, was familiar with the billing procedures of the water department, and each testified that members of the "general public" who reside within the city limits and are connected to the sewer system typically pay a minimum sewer fee. But neither Ms. Taylor nor Mr. Stephens testified that it is unusual for members of the "general public" who do not "receive or accept" a particular service to be excused from paying the minimum fee for that service. Moreover, Ms. Taylor conceded on cross-examination that "[a] lot of people" within the city limits paid only the minimum water charge and were excused from paying the other minimum charges. In light of Ms. Taylor's testimony, Mr. Allen's manner of payment appears consistent with that of the general public.

More important, a Gould ordinance establishes that the manner in which Mr. Allen paid for municipal services was perfectly consistent with the manner in which the general public was allowed to make payments. The ordinance provided for the assessment of sewer fees on "all users who contribute wastewater to the City of Gould treatment works." By the terms of the ordinance, no sewer fee was required of a customer unless (1) he was a user of the sewer service; and (2) he contributed wastewater to the City's sewer system.

Under the law of the City of Gould, then, it was entirely permissible for a person who did not use, or contribute wastewater to, the sewer system to avoid paying a sewer fee. The State did not show that Mr. Allen qualified as a "user" of the sewer

system or a "contributor of wastewater." The ordinance establishes that Mr. Allen's manner of payment comported with the manner of payment for municipal services prescribed by the "general public" of Gould.

As the ordinance was applicable to all citizens of Gould, the majority is wrong to say that Mr. Allen's manner of payment constituted "preferential treatment not available to the general public." Clearly, *any* Gould citizen who did not use, or contribute wastewater to, the city sewer system could avoid payment of any sewer fee by operation of this ordinance.

### 2. Count 2

In order to affirm Mr. Allen's conviction under § 14-42-108(b)(1), we must be able to conclude there is substantial evidence that Mr. Allen furnished or gave municipal services to other customers without requiring them to pay "the usual and regular rates . . . in the usual manner." According to the majority opinion, violation of that statute was shown by testimony that Mr. Allen adjusted the water bills of certain citizens who used the city's water and sewer services.

There is no question that Mr. Allen made the adjustments mentioned in the majority opinion, but there is no proof whatsoever that he, in making these adjustments, permitted the customers to receive services without paying "the usual and regular rates . . . in the usual manner." The evidence showed that Mr. Allen, who was serving as the head of the water department, in addition to being Mayor, received numerous complaints from customers about the amount of their water bills. Some of the customers had faulty meters or leaky water lines. Mr. Allen determined that the increase in charges was the result of error on the City's part, and he adjusted the bills.

What part of § 14-42-108(b)(1) prohibits a mayor, who is doubling as the head of the water department, from responding to allegations of erroneous billing procedures by adjusting the water bills of the complaining citizens? The majority suggests that Mr. Allen lacked authority to adjust any customer's bill without the approval of the City Council, and it mentions a city ordinance that

permitted, but did not require, citizens to air their grievances before the City Council. What the majority overlooks is that the ordinance did not purport to establish an exclusive procedure for hearing customers' complaints, and it did not divest Mr. Allen of his authority, especially that arising from his role as head of the water department, to respond to customers' complaints by adjusting their bills. Again, the principle of strict construction falls by the wayside.

The manner in which customers were permitted to pay for municipal services was not shown to be contrary to the manner in which those members of the "general public" who have complained about erroneous billing practices have paid for such services. Not a single witness testified that a customer with similar grievances would be treated any differently than the customers who received adjustments from Mr. Allen. There simply was no evidence on the question of how customers who, in general, complain about overbilling go about paying for water services. That kind of evidence was necessary in order to show that Mr. Allen treated the complaining customers in this case better or differently from any other similarly situated customer. We do not have such evidence in the record, and therefore the conviction on this count should also be reversed.

As the convictions on both counts should be reversed, there is no need to address Mr. Allen's claim that he was denied equal protection of the law in the application of Ark. Code Ann. § 14-42-108(c)(2) and Ark. Const. art. 5, § 9, to remove him from his office because of the convictions.

I respectfully dissent.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

March 17, 1997

CR 96-1099 939 S.W.2d 270

Supplemental Opinion Denying Motion for Rehearing.

*John Wesley Hall, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *O. Milton Fine II*, Asst. Att'y Gen., for appellee.

RAY THORNTON, Justice. In his petition for rehearing, Mr. Allen contends that we failed to address his argument that the statute before us did not afford him the equal protection of the laws because county officials were not subject to its provisions. County officials are not covered by Ark. Code Ann. § 14-42-108; however, neither are most municipal officials nor any state officials covered by the provisions of the statute. In response to Mr. Allen's argument, we pointed out the following in our opinion: .

> To meet his burden, appellant must show that the disparate statutory treatment of county and city officers is arbitrary and capricious and is completely devoid of any legitimate purpose. *Reed v. Glover*, 319 Ark. 16, 22, 889 S.W.2d 729, 732 (1994).

*Allen v. State*, 327 Ark. 350, 939 S.W.2d 270 (1997). Mr. Allen's argument is answered by the next few paragraphs of our decision.

There, we clearly point out that the classification accomplished by the statute must be rationally related to a legitimate objective, and that there must be a nexus with those state objec-

tives so that the "legislation is not the product of utterly arbitrary and capricious government purpose and void of any hint of deliberate and lawful purpose." *Id.* at 358, 939 S.W.2d at 274 (quoting *Cook v. State*, 321 Ark. 641, 648, 906 S.W.2d 681, 685 (1995)). We then found that with the privilege of holding certain offices comes unique statutory responsibilities and power, and Mr. Allen's convictions reflected an abuse of trust that triggered the statutory exclusion from eligibility to hold municipal office in order to protect "the public from a recurrence of the abuses which led to the convictions."

Like county officials, municipal officials in cities that do not operate utility services are not covered by the statutory architecture that Mr. Allen challenges. Our decision carefully considered the constitutional challenge of disparate treatment, and concluded as follows:

> The convictions that led to appellant's removal involved an abuse of power that the public specifically entrusted to [some] municipal officials. There is a nexus between the grant of power and the protection provided to the public. We find that coupling an extraordinary statutory grant of power to a municipal officer with a provision of ineligibility to hold office if that power is abused is rationally related to a legitimate state purpose.

*Id.* at 360, 939 S.W.2d at 275.

It was clear that the statute did not apply to all municipal officers, to county officers, or to officers of the state; however, we fully and completely addressed the issue whether the statute passed constitutional muster on equal protection of the laws. Our decision is unchanged, and the motion for rehearing is denied.

GLAZE, J., concurs.

NEWBERN, J., dissents.

TOM GLAZE, Justice, concurring. A. B. Allen complains that the court failed to address his equal protection argument. The majority opinion specifically restated Allen's argument, stating, "Appellant contends that the provisions for removal and ineligibility established for municipal officers are unconstitutional because they deny to appellant the equal protection of the laws in that

county officials are not subject to the same provisions." The majority opinion then continued by addressing the rational basis aspect of Allen's argument and explains away Allen's assertion that there is no rational basis for the distinction drawn by certain constitutional and statutory provisions dealing with removal of city and county officials. I need not further readdress the majority opinion on this point.

What I do mention is that Allen's argument was wrong from its inception because he misidentified the classes. The charges against Allen centered on Ark. Code Ann. § 14-42-108 (1987), which makes it unlawful for a municipal official (1) to receive water, gas, or electric current without paying for it at the same rate as the general public, and (2) to furnish any person service from any public utility unless payment is made at the usual and regular rates. Only city officials violating these statutory provisions are subject to removal from office. Allen in no way contends that county officials engage in this same or similar conduct, namely, providing such utility services.

In sum, I agree that Allen's rehearing petition should be denied, and although I think his equal protection argument was sufficiently addressed by the majority court, I add only my above thoughts.

DAVID NEWBERN, Justice, dissenting. The appellant, A.B. Allen, has petitioned this Court to rehear his claim that the statute by which he was removed from the Gould mayoralty and barred from holding office in that City denies him equal protection of the law. Mr. Allen claims in his petition that the majority opinion left "the question unresolved." If the majority of this Court could satisfactorily resolve that issue, I might join in the denial of rehearing, although I dissented on other points. Because Mr. Allen is correct in his assertion that the equal protection issue was ignored in the majority opinion, the majority has a duty at least to address the issue in a supplemental opinion.

On appeal, Mr. Allen asserted that Ark. Code Ann. § 14-42-108(c)(2) (1987), which requires the removal from office of any city official convicted under §§ 14-42-108(a)(1) or 14-42-108(b)(1) and renders the official ineligible to hold any city office

thereafter, is unconstitutional because it denied him equal protection of the laws. Mr. Allen asserted that, under the statutes and case law governing the removal of errant *county* officials, a county official convicted for a similar offense would not be declared ineligible to hold county office if he or she were re-elected after the commission of the offense. Mr. Allen's position was that § 14–42–108(c)(2), by not affording this "interceding election" defense to city officials, denied him equal protection.

The majority opinion does not respond to this charge of disparate treatment of city officials and county officials. The majority correctly identifies the standard by which we review equal protection claims, and it correctly states that the legislature may provide for the removal and ineligibility of *any* public official convicted of certain offenses, but it does not explain how the enforcement of a provision of removal and ineligibility against city officials, but not county officials, comports with equal protection guarantees.

The error in assuming that such an explanation is sufficient results from focusing solely on city officials rather than comparing them with the other class, *i.e.,* county officials. The best the majority opinion can offer is a singularly unsupported, and in my view insupportable, conclusion that the granting to city officials of "extraordinary . . . power" requires an extraordinary remedy. Is that a suggestion in the Court's opinion that the authority to run a waterworks confers a greater trust upon a city official than, for example, the authority given to county officials to run a road-building program? If so, I know of no rational basis or authority for it.

This Court should identify the rational basis, if any, for treating one class of public officials differently from another, and it has not done so.

I respectfully dissent from the denial of the petition for rehearing.