Lawrence Edward MARTIN *v*. STATE of Arkansas

CR 95-1314                                     944 S.W.2d 512

Supreme Court of Arkansas
Opinion delivered May 5, 1997

*J. Blake Hendrix*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. The appellant, Lawrence Edward Martin, was sentenced to life imprisonment without parole for the capital murder of his mother, Thelma Artis. On appeal, Martin raises several challenges to his conviction. Finding no reversible error, we affirm.

On April 22, 1994, around 5:00 in the evening, Gloria Carter visited Thelma Artis in her apartment in Little Rock, Arkansas. Ms. Artis was a sixty-three-year-old woman who lived alone and used a wheelchair. Around 10:00 p.m. that same evening, a neighbor and the assistant apartment manager observed a black male with very short hair angrily knocking on the front door of Ms. Artis's apartment. The man was wearing a t-shirt and shorts. According to the witnesses, the visitor exclaimed, "Open up, it's your son!" as he pounded on the door. Around 12:30 a.m., another witness spotted a black male with very short hair wearing a t-shirt and shorts run from the apartment complex.

The next morning around 9:00, Gloria Carter and the apartment manager discovered Thelma Artis's slain body on the floor of her living room next to her toppled wheelchair. Ms. Artis was in her nightgown and a pillow was placed over her face. Carter and the manager also observed that the door was unlocked and the chain was not fastened.

The police arrived and determined that Ms. Artis died as a result of multiple stab wounds to her neck and face. In addition, Ms. Artis's hands contained defensive wounds and scratches. There were no signs of a forced entry into the apartment, and the only items that appeared to be missing were four rings that Ms. Artis customarily wore. Finally, the police noticed that the kitchen trash can contained only a coke can and a cellophane sandwich bag. Both items were dusted for fingerprints.

On April 23, the day after the murder, the police began questioning Ms. Artis's sons. The police located Lawrence Martin around 10:00 p.m., and he agreed to accompany them to the police station to answer some questions. While at the station, Martin gave a taped statement regarding his whereabouts on the night of the murder. Martin told the police that on April 22 he picked-up his pay check, drove to Pine Bluff, and spent the night driving, drinking, and smoking marijuana. Martin claimed that he threw away his work clothes and bought a new set of clothing at a flea market. Martin, however, could not tell the police where he obtained gas or ate, and he was unable to name anyone who could confirm his story. Martin also told the police that he had

previously sought drug rehabilitation for his marijuana and crack cocaine habits.

After his statement, the police told Martin that he was not under arrest, but that he was a suspect in the murder. The police then read Martin his *Miranda* rights, and he executed a waiver form. At this point, Martin refused to give a second statement and the interview was terminated. Martin was transported back to his home.

A few days later, the assistant apartment manager quickly identified Martin's photograph in a photographic line-up and stated that he "looked very similar" to the man he observed knocking on Ms. Artis's door. In addition, the forensic department identified Martin's fingerprint on the soda can discovered in Ms. Artis's trash. Based on this additional evidence, the police arrested Martin and charged him with capital felony murder.

During the trial, several witnesses testified that Ms. Artis would always respond to a visitor's knock on her door by asking who it was and then opening the door with the chain still latched to confirm the visitor's identity. Ms. Artis's daughter, Debra Dillard, testified that Ms. Artis wore four rings, that "she never pulled them off," that she "wore them every day," and that she would even wear her rings to bed. The State then displayed to the jury photographs of indention and tan marks on Ms. Artis's hands where the four rings were likely to have been worn.

Martin's brother, Donald Ray Lewis, and his sister, Debra Dillard, testified that two days after the murder they met Martin at their mother's apartment. Martin told his siblings that he spent the night of the murder driving in Pine Bluff while drinking and using marijuana and crack cocaine. Although Martin initially claimed that he was driving with a friend, he later told his family that he was alone. Martin explained that he threw away his clothing because they had a foul odor, and that he purchased a new set of clothing from a flea market. Martin, however, could not remember where the flea market was located.

Martin's wife, Wanda, testified on cross-examination that she suspected that her husband was smoking crack cocaine on the

night of the murder, and that they had previously experienced marital difficulties due to his use of the substance. The State then introduced evidence that a crack cocaine habit could cost as much as $350 to $500 a day, and that dealers would accept jewelry and other property in exchange for illegal drugs.

After deliberations, the jury found Martin guilty of capital murder during the course of an aggravated robbery. Because the State did not seek the death penalty, the court imposed the sentence of life imprisonment without parole. From his judgment and commitment order, Martin filed a timely notice of appeal.

## I.  Sufficiency of the Evidence

For his first argument on appeal, Martin challenges the sufficiency of the evidence to support his conviction of capital felony murder. As we have previously explained, in making this determination we view the evidence in the light most favorable to the State and will affirm where there is substantial evidence to support the verdict. *Hicks v. State*, 327 Ark. 652, 941 S.W.2d 387 (1997); *Allen v. State*, 327 Ark. 350, 939 S.W.2d 270 (1997). This review necessarily includes evidence both properly and improperly admitted, and we are required to consider only the testimony that supports the verdict. *Hicks, supra.* Finally, the evidence, whether direct or circumstantial, is considered sufficient if it is of enough force to compel a conclusion one way or the other and goes beyond mere suspicion or conjecture. *Hicks, supra; Johnson v. State*, 326 Ark. 3, 929 S.W.2d 707 (1996).

On appeal, Martin concedes that there was sufficient evidence for the jury to conclude that he killed Ms. Artis; hence, the sole inquiry is whether there was sufficient evidence to support the underlying crime of aggravated robbery. *See Clay v. State*, 324 Ark. 9, 919 S.W.2d 190 (1996). Martin argues that the circumstantial evidence that Ms. Artis's rings were missing was not substantial proof that they were taken in the course of a robbery.

We disagree with this argument for several reasons. First, direct evidence that a robbery occurred is not required to support an underlying charge of aggravated robbery. To the contrary, in *Harris v. State*, 308 Ark. 150, 823 S.W.2d 860 (1992), we

said that circumstantial evidence is "entirely sufficient to deny a motion for directed verdict and submit the issue to the jury." Likewise, in *McClendon v. State*, 295 Ark. 303, 748 S.W.2d 641 (1988), we found that a witness's testimony that four or five hundred dollars were missing from the victim's pants was sufficient circumstantial evidence to support the underlying charge of robbery in a capital murder case.

■ During Martin's trial, several witnesses testified that Ms. Artis always wore rings, and her daughter claimed that she did not remove them even when she went to bed. The jury was also shown photographs of indention and tan marks on Ms. Artis's fingers where she likely wore her rings. We find that this evidence, albeit circumstantial, was sufficient to support the jury's conclusion that Ms. Artis's rings were removed and taken by the person who killed her. Therefore, we find no merit to Martin's first argument on appeal.

## II. Failure to Suppress Statements to the Police

Next, Martin claims that the trial court committed reversible error when it refused to suppress the taped statement he gave to the police on April 23. Martin argues that the statement should have been suppressed because it was taken in violation of Ark. R. Crim. P. 2.3 and his right to receive *Miranda* warnings.

Before addressing the merits of these two arguments, it should be noted that the State asserts that Martin failed to properly raise these issues before the trial court. We strongly disagree with the State's contention.

In December, Martin filed a *pro se* motion regarding a violation of Ark. R. Crim. P. 2.3, and his attorney filed a motion to suppress the statement based on the alleged *Miranda* violation. During a pretrial hearing, Martin's counsel addressed the alleged Rule 2.3 violation, and the judge delayed his ruling so that both sides could submit posthearing briefs on the issue. Although Martin submitted a brief, it does not appear from the record that the State complied with the trial judge's request. Finally, the trial court rendered a ruling on both issues. Therefore, we find that

contrary to the State's assertion both issues have been properly preserved for appeal.

### A. Arkansas Rule of Criminal Procedure 2.3

Martin claims that Ark. R. Crim. P. 2.3 was violated when the police appeared at his house on April 23 without a warrant, asked him to come to the station for questioning, and failed to notify him that he did not have to comply with this request. We agree with Martin's argument, and accordingly we find that the statement should have been suppressed.

In *United States v. Mendenhall*, 446 U.S. 544 (1980), the United States Supreme Court first defined the type of police conduct that amounted to a "seizure of the person" under the Fourth Amendment. Instead of adopting a bright-line rule, the Supreme Court opted for a totality-of-the-circumstances approach and held that:

> a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

*Id.*

In accordance with the *Mendenhall* test, the Arkansas Rules of Criminal Procedure state that:

> If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, he shall take such *steps as are reasonable* to make clear that there is no legal obligation to comply with such a request.

Ark. R. Crim. P. 2.3 (emphasis added). As in *Mendenhall*, our initial cases interpreting Rule 2.3 reviewed the totality of the circumstances to determine if the officers had taken reasonable steps to advise the citizen that he or she was not obligated to comply with the officer's request. *Burnett v. State*, 295 Ark. 401, 749 S.W.2d 308 (1988); *Foster v. State*, 285 Ark. 363, 687 S.W.2d 829 (1985), *cert. denied*, 482 U.S. 929 (1987).

For example, in *Burnett*, six armed officers awoke Burnett at approximately 6:00 a.m. and told him to get dressed and to come to the station. *Burnett, supra.* Burnett was not arrested, but neither was he told that he did not have to comply with the officers' instructions. *Burnett, supra.* Upon arrival at the police station, Burnett gave the police an inculpatory statement, which on appeal, he argued should have been suppressed because he was unlawfully seized by the police. *Burnett supra.* Citing both Rule 2.3 and the *Mendenhall* test, we found that:

> Considering the totality of the circumstances, we conclude that Burnett was seized at his home in violation of the Fourth Amendment. The officers did not comply with our rules of criminal procedure, which require that an officer inform a person that he is free not to accompany the officer if the officer does not have a warrant. A reasonable person in Burnett's position would have thought that he had no choice except to accompany the officers to the police station.

(Internal citations omitted.) Thus, by looking at the totality of the circumstances and the officers' failure to inform Burnett that he was free to decline their request, we held that the police officers' conduct amounted to an unlawful seizure under Rule 2.3, and accordingly, Burnett's statement should have been suppressed.

█ Over the years, we have departed from our totality-of-the-circumstances approach to Rule 2.3 and have replaced it with the bright-line rule that a statement must be suppressed under Rule 2.3 if the police officers simply fail to notify the person that they do not have to come to the station for questioning. *Burks v. State*, 293 Ark. 374, 738 S.W.2d 399 (1987); *Addison v. State*, 298 Ark. 1, 765 S.W.2d 566 (1989); *Hart v. State*, 312 Ark. 600, 852 S.W.2d 312 (1993); *Prowell v. State*, 324 Ark. 335, 921 S.W.2d 585 (1996). In these cases, we have imposed a "positive duty" upon the police to inform the citizen of his or her right to refuse the request although the plain words of Rule 2.3 do not specifically require such a verbal notice. We acknowledge that our recent case law has placed a greater burden on the police than was initially required by either *Mendenhall* or our earlier cases interpreting Rule 2.3. *See, Burks, supra; Addison, supra.* However, the

bright-line rule is the course this court has chosen to follow, and we decline to depart from our precedent at this time.

During Martin's suppression hearing, the witnesses testified that at approximately 10:00 p.m. on April 23, Martin's wife called the police to notify them that Martin had returned from Pine Bluff. Shortly thereafter, four armed officers arrived at Martin's house and asked him to come to the station for questioning. Although Martin was not placed under arrest, it appears that the officers did not notify him that he could refuse their request. Based on our recent decisions, this fact alone amounted to a violation of Rule 2.3. Therefore, we find that the trial court erred when it refused to suppress Martin's taped statement.

This, however, does not end our inquiry because we have previously recognized two exceptions to a Rule 2.3 violation. First, we have held that a Rule 2.3 violation is excused when the police had probable cause to arrest the defendant at the time of the request. *Burks, supra; Addison, supra; Hart, supra.* Because the State did not argue that there was probable cause to arrest Martin, we do not consider this exception to Rule 2.3.

As we noted in *Prowell,* a Rule 2.3 violation will also be excused where the admission of the inculpatory evidence resulted in mere harmless error. *Prowell, supra.* Moreover, we have consistently held that the failure to suppress evidence is not prejudicial error when the same or similar evidence was otherwise properly admitted. *Weber v. State,* 326 Ark. 564, 933 S.W.2d 370 (1996); *Jones v. State,* 326 Ark. 61, 931 S.W.2d 83 (1996).

During Martin's trial, his brother and sister testified that Martin told them that on the night of the murder he was in Pine Bluff driving, drinking, and smoking crack cocaine, and that he threw away his clothes and bought a new set. In fact, the siblings' testimony is almost a verbatim recitation of the alibi statement that Martin gave to the police. In addition, Martin's wife testified that she suspected that Martin was using crack cocaine on April 22, and that they had previously encountered marital difficulties due to his use of the substance. Therefore, we cannot say that the failure to suppress Martin's taped statement was prejudi-

cial, reversible error. Accordingly, we affirm Martin's conviction on this point.

### B.   Miranda *Warnings*

Martin also contends that his taped statement was inadmissible because the police did not advise him of his *Miranda* rights before questioning him. It is well settled that the safeguards prescribed by *Miranda* are applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest. *Johnson, supra; State v. Spencer,* 319 Ark. 454, 892 S.W.2d 484 (1995). As explained above, we agree that the police unlawfully "seized" Martin, and thus we can say that his freedom was sufficiently "curtailed" such that the *Miranda* warnings should have been given to him prior to the questioning.

During the suppression hearing, the officers admitted that they did not *Mirandize* Martin until after he gave his taped statement. Therefore, we agree that Martin's constitutional right to *Miranda* warnings was violated, and therefore the statement should have been suppressed. However, as we have already mentioned, the admission was mere harmless error in light of the testimony of Donald Lewis, Debra Dillard, and Wanda Martin. We acknowledge that when constitutional errors are involved the error must be "harmless beyond a reasonable doubt." *Isbell v. State,* 326 Ark. 17, 931 S.W.2d 74 (1996); *Schalski v. State,* 322 Ark. 63, 907 S.W.2d 693 (1995). We conclude that the error in this case also satisfies this heightened standard; therefore, we also affirm on this point for reversal.

### III.   *Arkansas Rule of Evidence 404(b)*

For his third argument on appeal, Martin claims that the trial court violated Ark. R. Evid. 404(b) when it allowed the State to play portions of his taped statement in which he admitted to previous medical treatment for his drug problems. During the trial, several witnesses testified, over Martin's objections, about his use of drugs on the night in question and on prior occasions. Although Martin does not specifically contest the admissibility of these statements on appeal, we find it necessary to address these

adverse rulings according to our obligation under Ark. S. Ct. R. 4-3(h).

According to Ark. R. Evid. 404(b), evidence of other crimes, wrongs, or bad acts may be admissible to prove motive. In fact, we have said that when the purpose of evidence is to show motive, "anything and everything that might have influenced the commission of the act may, as a rule, be shown." *Lee v. State*, 327 Ark. 692, 942 S.W.2d 231 (1997); *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996); *Cooper v. State*, 324 Ark. 135, 919 S.W.2d 205 (1996). Furthermore, the State is entitled to produce evidence showing circumstances which explain the act, show a motive for killing, or illustrate the accused's state of mind. *Lee, supra*; *Echols, supra*; *Smith v. State*, 310 Ark. 247, 837 S.W.2d 279 (1992).

Of particular relevance to this case, is our recent decision in *Lee, supra*, where we affirmed the State's introduction of evidence of the defendant's drug use as a motive for robbing and killing the victim. Likewise, in *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996), we ruled that testimony regarding the victim's refusal to transport drugs for the defendant was properly introduced as evidence of the defendant's motive to kill her. In both of these cases, we emphasized that wide latitude is given to the trial court in allowing the introduction of bad character evidence which also shows motive. *Lee, supra*; *Johnson, supra*.

As in *Lee* and *Johnson*, during Martin's trial, the State introduced evidence of his drug use as a motive for the aggravated robbery and murder. In particular, the State hypothesized that Martin robbed and killed his mother in order to obtain property that he could use to purchase drugs. Therefore, we find that the trial court did not abuse its broad discretion in allowing the witnesses to testify as to Martin's drug use.

As to the admissibility of Martin's taped statement, we have already concluded that it is merely duplicative of the witnesses' testimony regarding Martin's alibi, his prior use of drugs, and his use of crack cocaine on the night of the murder. Therefore, we once again conclude that the improper admission of Martin's taped statement was mere harmless error.

## IV. Police Officer's Testimony

During the trial, an undercover police officer was allowed to testify that a crack cocaine habit can cost as much as $350 to $500 a day, and that crack cocaine may be exchanged for personal property, including jewelry. The court allowed the officer to make these statements based on his police training, his six years of service in the narcotics division, and his experiences making drug trades as an undercover officer. Although the record reveals that the officer was neither offered nor recognized as an expert, the State asserts that the officer testified as an expert.

On appeal, Martin claims that the police officer's testimony should have been excluded because he had no personal knowledge of Martin or his alleged drug use. We cannot agree with this assertion for several reasons. First, in *Ferrell v. State*, 305 Ark. 511, 810 S.W.2d 29 (1991), we held that a witness with extensive experience and technical knowledge of pistols could testify as to the possibility of a .25 caliber pistol accidentally firing even though the witness was not specifically offered or recognized as a firearms expert. Moreover, in *Ferrell*, it was the witness's technical knowledge of firearms, not his knowledge of the defendant, that qualified him to testify about pistols.

As in *Ferrell*, the police officer in Martin's case had specialized training and experiences in the drug trade. Although the officer did not personally know Martin, he did have specialized knowledge of the drug trade. As mentioned previously, the State's theory of the case was that Martin killed his mother in order to exchange her rings for drugs. Thus, the officer could have qualified as an expert with specialized knowledge to assist the jury in determining a fact in issue under Ark. R. Evid. 702. For these reasons, we find that the trial court did not abuse its discretion when it allowed the officer's testimony.

## V. Arkansas Supreme Court Rule 4-3(h)

In accordance with Ark. S. Ct. R. 4-3(h), the record has been reviewed for rulings decided adversely to Martin but not argued on appeal, and no reversible errors were found.

Affirmed.

BROWN, J., concurring; GLAZE and THORNTON, JJ., join in the concurrence.

ROBERT L. BROWN, Justice, concurring. I concur in the judgment but write separately because I disagree with the majority's conclusion that the trial court erred when it did not suppress the statement Martin gave to Little Rock Police Detectives Steve Moore and Ronnie Smith at the initial interview.

It is clear that following the murder, the police investigation began with attempts to interview Thelma Artis's sons based on information that a man identifying himself as her son was seen knocking on her door the previous night. Detective Moore testified that he interviewed one of the sons, Tony Bell, at Bell's house during the day of April 23, 1994, and determined that he had an alibi. Donald Ray Lewis, another of the sons, was questioned when he arrived at his mother's apartment, and was again questioned on April 25, 1994, by Detective Mike Durham at the Little Rock Police Department. Two other sons, one who was then in Japan, and the Reverend Billy Artis of Pine Bluff, were quickly ruled out as possible suspects.

During the day of April 23, 1994, Detective Moore set out to interview Martin and discovered that he was not home. The detective asked Martin's wife to call when Martin arrived, and at approximately 10:00 or 10:15 p.m. that night, Detective Moore received a call from Mrs. Martin informing him that Martin was home. At approximately 10:30 p.m., Detectives Moore and Smith, along with Sergeant Clyde Steelman and Detective Armstrong, arrived at Martin's house. Detective Moore testified that Martin voluntarily accompanied them in response to their request for questioning. Martin sat in the back seat of Detective Moore's car without handcuffs. He was not questioned in an interrogation room, but in a sergeant's office about his whereabouts on the previous night. At the close of the statement, Martin acknowledged that he had agreed to accompany the police officers to the police station and executed a waiver of rights form. However, Martin refused to give an additional statement, and he was transported home by members of the police department.

Martin was not arrested that night. In fact, a warrant for his arrest was not issued until five days later — April 28, 1994 — and only after it was found that one of his fingerprints was on the Coke can discovered in the victim's trash. Although Detective Smith admitted that Martin matched a known physical description of the man seen knocking on Ms. Artis's door, both Detectives Moore and Smith explained that Martin was treated only as a potential fact witness when he arrived at the station for the first interview. According to both detectives, it was only after Martin gave his implausible statement at that interview that he became a suspect in his mother's murder.

In light of these facts, the majority concludes that Martin's statement should have been suppressed for the sole reason that Detectives Moore and Smith violated Rule 2.3 of the Arkansas Rules of Criminal Procedure when they did not expressly inform him that he had no legal obligation to accompany them to the police station for questioning. Because I question the propriety and necessity of mandating a verbal statement to this effect by police officers under Rule 2.3, I believe that an examination of our precedent is in order.

Rule 2.3 was adopted by this court by *per curiam* order in 1975. *See In re The Arkansas Criminal Code Revision Comm'n*, 259 Ark. 863, 530 S.W.2d 672 (1975). It reads:

> If a law enforcement officer acting pursuant to this rule requests any person to come to or remain at a police station, prosecuting attorney's office or other similar place, he shall take such steps as are reasonable to make clear that there is no legal obligation to comply with such a request.

This court's decisions over the past ten years stand for the proposition that a person in Martin's position must, at some time, be verbally warned that he has the right to leave at any time. *See, e.g., Johnson v. State*, 325 Ark. 197, 926 S.W.2d 837 (1996); *Prowell v. State*, 324 Ark. 335, 921 S.W.2d 585 (1996); *Hart v. State*, 312 Ark. 600, 852 S.W.2d 312 (1993); *Addison v. State*, 298 Ark. 1, 765 S.W.2d 566 (1989); *Kiefer v. State*, 297 Ark. 464, 762 S.W.2d 800 (1989); *Burks v. State*, 293 Ark. 374, 738 S.W.2d 399 (1987). It is also clear that, under this line of cases, a failure to

comply with Rule 2.3 mandates suppression of the statement unless there existed probable cause to seize the declarant. *Hart v. State, supra; Addison v. State, supra; Kiefer v. State, supra; Burks v. State; supra.*

The Rule 2.3 analysis currently employed by this court has its roots in the decision of *Foster v. State,* 285 Ark. 363, 687 S.W.2d 829 (1985). In *Foster,* police officers approached the defendant's residence at 2:30 a.m. and represented to her that the prosecutor wanted to speak with her at his office. The police officers took her to the prosecutor's office, obtained a waiver of her *Miranda* rights, and questioned her, with minimal assistance from the prosecutor, about her involvement in a contract killing. This court determined that she was illegally arrested because the police officers misused the prosecutor's authority to summon people for questioning. In discussing its determination that the defendant did not voluntarily submit to the questioning, this court discussed Rule 2.3:

> Rule 2.3 provides that if, pursuant to this rule, the officer asks any person to come or remain at a prosecuting attorney's office, *the officer shall take steps to make clear that there is no legal obligation to comply with the request.* To the contrary, no steps were taken here. In fact, one of the officers agreed during his testimony that Mrs. Foster did not volunteer for questioning but only went to the prosecutor's office "because four officers came to her house and picked her up and carried her down there." The fact that Mrs. Foster accompanied the officers without being arrested or forced to comply does not demonstrate acquiescence. "[C]onsent to an invasion of privacy must be proved by clear and positive testimony — a burden that is not met by showing only acquiescence to a claim of lawful authority." *Meadows v. State,* 269 Ark. 380, 602 S.W.2d 636 (1980). Such acquiescence is all the state has been able to demonstrate here.

*Foster v. State,* 285 Ark. at 367, 687 S.W.2d at 830 (emphasis added). On these facts, this court determined that, under the totality of the circumstances, the defendant's confession was tainted by the illegal arrest.

From *Foster,* this court molded the requirement that police officers must actually state to persons that they have no legal obli-

gation to comply with a request for questioning. In *Burks v. State, supra,* this court, citing *Foster v. State, supra,* determined Rule 2.3 created the "positive duty" to inform appellant that he was free to leave the Little Rock Police Department, and that the failure to do so indicated a lack of proof that appellant had consented to the interrogation. As such, the interrogation was deemed custodial and a seizure of appellant that required probable cause.

To the same effect is *Kiefer v. State, supra,* in which appellant, accompanied by his wife, reported to the police station for questioning as the result of a telephoned request by Hoxie Police Chief Paul Hendrix. After waiving his rights, appellant gave a statement incriminating himself on charges of rape and incest. However, because Chief Hendrix did not specifically state to appellant that he was not required to come to the office, this court determined that under *Foster v. State, supra,* and *Burks v. State, supra,* his statement was to be suppressed absent a finding of probable cause.

From these cases, it is apparent that (1) expressly stating that a person is not obligated to accompany members of law enforcement is the only possible method of satisfying Rule 2.3; and (2) compliance with Rule 2.3 is the only mechanism whereby it can be proven that a person who was taken to a police station for questioning was not illegally arrested.

Our cases interpreting Rule 2.3 go much further than what is required by the United States Supreme Court. In *United States v. Mendenhall,* 446 U.S. 544 (1980), the Court established the relevant test for determining whether a person has been "seized" for purposes of the Fourth Amendment:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of such circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member

of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id.* at 554–55 (internal citations omitted). In forming this analysis, the Court noted explicitly that the question of whether a seizure occurs is not dependent upon whether a person is told that they are free to decline to cooperate because the voluntariness of the response is not dependent upon having been so informed. *Id.* at 555, *citing Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

A number of jurisdictions have had occasion to apply the dictates of *Mendenhall* to facts analogous to those presented by the instant case. For example, in *State v. Hunt*, 555 A.2d 369 (Vt. 1988), the Supreme Court of Vermont rendered a decision that is particularly apposite to this case. In *Hunt*, police officers were investigating a murder case and asked the defendant if he would mind coming to the police station to answer some "routine questions." Although the police officers testified that they intended to take statements from a number of people, the defendant was the first person questioned because of his "unnatural curiosity at the crime scene . . . [and] his presence in the building at the time of the murder." *Id.* The defendant accompanied the officers to the police station, waived his *Miranda* rights, and eventually gave a confession to the murder. On appeal, the defendant argued that his confession should have been suppressed because he was illegally seized when, without probable cause, the police asked him to come to the police station without informing him that he had no legal obligation to accompany them. The argument was made under the Vermont Constitution, because the defendant conceded that, under the United States Constitution, "it is clear that the failure to inform a defendant that he or she could withhold consent to accompany the police is not sufficient to establish the existence of illegal coercion." *Id.* at 376, *citing United States v. Watson*, 423 U.S. 411 (1976); *Schneckloth v. Bustamonte, supra.*

The defendant also argued that, under the totality of the circumstances, he was unlawfully seized because his compliance with the police request was involuntary. The Vermont Supreme Court quickly dismissed this argument:

On the facts of this case we conclude that no seizure of defendant occurred when he voluntarily accompanied the police to the station for questioning. Defendant was not seized simply by the fact that the officers asked him to join them for questioning. See *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877. *In addition, "the fact that [defendant] was not expressly told by the [officers] that [he] was free to decline to cooperate with their inquiry" does not turn the approach into a seizure since "the voluntariness of [his] response does not depend upon [his] having been so informed."* Mendenhall, 446 U.S. at 555, 100 S.Ct. at 1878. We find no evidence of express or implied duress or coercion, and neither threats nor show of force. Defendant was simply asked if he would mind accompanying the police to the station for routine questions, and he agreed.

*Id.* at 377-78 (emphasis added).

Absent the circumstances of coercion discussed in *United States v. Mendenhall, supra,* appellate courts are uniform in determining that a person has not been "seized" for purposes of the Fourth Amendment when he voluntarily submits to a request for police questioning. *See, e.g., People v. Torres,* 669 N.E.2d 1279 (Ill. App. 3 Dist. 1996)("[W]here a defendant is simply asked to accompany officers without threats or show of force there is no impermissible seizure of the individual."), *quoting People v. Patton,* 412 N.E.2d 1097, 1100 (Ill. App. 3 Dist. 1980); *State v. Osborn,* 547 N.W.2d 139, 145 (Neb. 1996)("It has been determined that one who voluntarily accompanies the police for questioning has not been seized."), *quoting State v. LaChappell,* 382 N.W.2d 343, 347 (Neb. 1986); *State v. Johnson,* 346 S.E.2d 596 (1986)(finding no seizure when the defendant accompanied officers to the police station per their request for questioning regarding a homicide investigation); *Dancy v. State,* 728 S.W.2d 772 (Tex. Cr. App. 1987)(finding no seizure when two officers went to appellant's home and asked that he accompany them to the police station); *DeLeon v. State,* 894 P.2d 608 (Wyo. 1995)(finding no seizure when there was no evidence in the record that the defendant was coerced into accompanying the detectives to the police station).

Particularly appropriate is the analysis utilized in *Dancy v. State, supra,* in which the question of "seizure" was analogized to

"custody" for purposes of the Fifth Amendment. The Texas Court of Criminal Appeals stated:

> If the circumstances show that the transportee is acting only upon the invitation, request, or even urging of the police, and there are no threats, express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not then in custody. In other words, under those circumstances, such person has not been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda v. Arizona, supra.*

*Dancy v. State*, 728 S.W.2d at 778.

From the foregoing, it is clear that the United States Constitution requires only that this court look to the totality of the circumstances to determine whether a "reasonable person" would have believed that he was free to decline a police officer's request for questioning. It is also certain that compliance with a law enforcement officer's request may be deemed voluntary absent being informed that there is no obligation to comply with the request. *United States v. Mendenhall, supra. See, e.g., State v. Hunt, supra.*

Yet, our precedent interpreting Rule 2.3 mandates a "positive duty" on the part of law enforcement to verbalize that the person need not comply with the police request. Because of this position, I must assert two points. First, the plain language of Rule 2.3 does not require a verbal warning in every case. Rather, the rule requires only that an officer "*take such steps as are reasonable* to make it clear that there is no legal obligation to comply with such a request." In my judgment, compliance with Rule 2.3 should be considered, consistent with Supreme Court precedent, by reviewing the totality of the circumstances surrounding the request.

Second, it must be noted that Rule 2.3, which was made effective in 1976 by *per curiam* order, was taken from the American Law Institute's Model Code of Pre-Arraignment Procedure. *See* American Law Institute, *Model Code of Pre-Arraignment Procedure* § 110.1(3) (Prop. Off. Draft 1975). It is apparent that we are the only jurisdiction to have adopted the ALI Model Code provision either by way of statute or rule of criminal procedure. To the

extent this court has interpreted Rule 2.3 to require a verbal warning in order to prove consent to a request for interrogation, it has done so based on a provision that was written prior to the Supreme Court's decision of *United States v. Mendenhall, supra.* Such an interpretation offers protection far greater than is required by the U.S. Constitution, and it is apparent that we may be a minority of one by having done so.

Under the facts of this case, the totality of the circumstances reflects that Martin, of his own free will, accompanied members of the Little Rock Police Department to the station for interrogation. Although four officers arrived at Martin's house at 10:30 p.m., it is clear that (1) Martin knew they were coming; (2) the officers did not touch or physically restrain Martin in any way; (3) Detectives Moore and Smith questioned Martin in a sergeant's office rather than an interrogation room; and (4) the detectives allowed Martin to leave, without comment, when he desired to do so. These facts make clear that Martin's rights under the Fourth Amendment were not violated, and his statement should not have been suppressed as the fruit of an illegal arrest. It is also obvious that the failure to obtain a waiver of his *Miranda* rights prior to the interrogation did not violate Martin's rights under the Fifth Amendment because he was not a suspect at that time. Clearly, under the totality of the circumstances, Martin's freedom of action was not curtailed to a degree associated with formal arrest. *See State v. Spencer*, 319 Ark. 454, 892 S.W.2d 484 (1995).

In sum, this court's interpretation of Rule 2.3 places a "positive duty" on law enforcement officers far beyond what is required by the United States Constitution and embraces our exclusionary aspect that only has the effect of "restrict[ing] the investigatory function of the police." *Dancy v. State*, 728 S.W.2d at 778, *quoting People v. Wipfler*, 368 N.E.2d 870, 873 (Ill. 1977). Based on the foregoing, I submit that our adherence to this precedent should be reconsidered.

I would affirm on the basis that under the totality of the circumstances Rule 2.3 was not violated.

GLAZE AND THORNTON, JJ., join.